(No. 32789.—

IN RE OGLE E. VEACH, Attorney, Respondent.

*Opinion filed September 24, 1953—Rehearing denied Nov. 16, 1953.*

HUGH V. MURRAY, JR., of Centralia, for the commissioners.

JOSEPH H. GOLDENHERSH, of East St. Louis, for respondent.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

This is a disciplinary proceeding instituted by the Committee on Inquiry of the Illinois State Bar Association against respondent, Ogle E. Veach. It was commenced by the filing, on April 10, 1952, of a complaint in sixteen counts charging respondent with solicitation of personal injury business, and in count 2 that he asked the mother

of an injured client to locate a person who would falsely testify on behalf of her son. The case was heard by the Committee on Grievances on July 20 and 21, 1952. On motion of respondent counts 12 to 16 were dismissed. On October 22, 1952, the Committee on Grievances filed its report and recommendations, which found each of the allegations from 1 through 11 to be true. Respondent filed objections thereto, and the matter was argued orally before the Board of Governors. The Board of Governors, as Commissioners, filed its report on February 10, 1953, adopting the findings of the Committee on Grievances except that objections were sustained to all of count 9 and to that part of count 2 charging respondent with having sought to induce the procuring of a false witness. No exception was filed by the Committee on Inquiry, so respondent now stands charged with only solicitation. The Committee on Grievances and the Commissioners recommend disbarment. Respondent filed exceptions in this court, and the entire record is here for review.

At the time of the hearing respondent was 50 years of age, married and living with his wife in St. Louis, Missouri. The record shows he was graduated from the high school at Marion, Illinois, and then attended college at Carbondale, Illinois, for two years. He then enrolled in the Benton College of Law at St. Louis, Missouri, from which he graduated in 1928 and was admitted to practice in Missouri. He practiced law in St. Louis until 1939, at which time he moved to his farm in Illinois, and in 1940 was admitted to practice in Illinois. From 1940 until May, 1951, he maintained offices in East St. Louis, Illinois. Since then he has not maintained an office in Illinois.

At the hearing several witnesses were produced by the Committee on Inquiry, most of whom had employed the respondent to recover damages for them on account of personal injuries. The purpose was to prove the allegations set forth in the various counts of the complaint.

In support of count 1 of the complaint, the record discloses that one Frank Herbstreith was on October 12, 1946, struck by an automobile near Shiloh, Illinois, and was removed to the St. Elizabeth Hospital in Belleville. Four days later, before he had asked to see any lawyer, the respondent, who was unknown to the witness, came to see him at the hospital and asked if anyone had been to see him. When informed that an insurance representative had been to see him, he asked if he (the representative) had left any paper. When he learned that a card had been left on the table, he went over to the table, picked up the card, read it, and exclaimed, "that man isn't any good."

At that time Herbstreith was in poor physical condition, and was suffering from injuries to his leg, his shoulder blade and neck, and was not fully conscious. The respondent, however, did obtain his signature to an employment contract.

Some few days later the respondent returned to the hospital with a newspaper which disclosed that he already had commenced suit in behalf of the witness. Herbstreith thereupon expressed surprise and informed the respondent that he was not to represent him. After Herbstreith was released from the hospital on October 25, 1946, the respondent attempted to interview him, but was ordered off his place.

The respondent in defense of his action claims he was introduced to Herbstreith by one Hugo Bartheleme, who, from the hospital records, appears to have been a patient therein from October 14, 1946, until October 18, 1946. The record further discloses that the respondent advanced the costs for filing the suit. Bartheleme was not produced as a witness.

In reference to count 2, the record discloses that in the afternoon of April 22, 1949, Andrew Switala, son of Andrew Philip Switala and Barbara Switala, suffered a fracture of his left leg and other injuries as a result of

an accident and entered the hospital at Belleville, Illinois. On the following morning, between 8 and 9 o'clock, a man came to the Switala home and obtained the signature to a contract employing the respondent as his attorney. Thereafter, the respondent made repeated visits to see the Switalas. Prior to this happening Switala had not known the respondent, and had not consulted with or asked to consult with any lawyer. While the evidence does not show that the respondent made the first contact with Andrew Switala, it does disclose that whoever the man was that did, he procured a signed contract for employment of respondent, and respondent apparently ratified his act of solicitation.

In reference to count 3, the record discloses that Frank Runyan, a sergeant in the United States Air Forces was injured in an automobile accident on August 5, 1950. He suffered four fractured ribs and a fractured collarbone. On August 7 or 8 the respondent came to the hospital and wanted to be his lawyer. Following this conversation, the sergeant signed a contract of employment with respondent. The testimony on the part of the sergeant discloses a case of direct solicitation on the part of the respondent of whom the sergeant had never had any previous knowledge. The respondent's justification for his action as set forth in his testimony is that he had been employed by the other two persons involved in the same accident, namely Todd and Thierrault, and came to see the sergeant because he was investigating the facts of the occurrence. He then says it was suggested that he also handle the sergeant's case. The record does not disclose the day when the suggestion was made.

In support of count 4 the record shows that one Wilson Cardwell became a patient in the Alton hospital in May, 1951, as a result of an accident. Two days afterwards respondent Veach, whom Cardwell had not previously known, came to the hospital and asked to be employed as his attor-

ney. Cardwell had not sent for him, neither had he made any request for consultation with a lawyer, nor that a lawyer be sent to him. Cardwell told the respondent that he was not interested in employing any lawyer, but after he felt better he might come to see him. Later, the respondent did call at his home, but he was informed that he, Cardwell, did not want him as his lawyer. Respondent claims that someone in his office, whom he does not identify, and who did not testify in this proceeding, received a telephone call requesting him to call at the hospital and see Cardwell. He says that when he went to see Cardwell a second time at the hospital, he had been discharged, but had left instructions as to where he lived. This Cardwell denies, but believes he might have told the respondent as to where he lived on the first meeting at the hospital.

In support of count 5 the record shows that John Yurkiv, Jr., was injured in an accident and hospitalized. He had his friend introduce Veach, as he wanted a lawyer. After hearing his story, Veach said he was going to see the other people and that was the last Yurkiv saw of him until the case came up in court.

The other people injured in that accident were Fred Pettie, Lee Pierce, and Griffin Suggs, all of whom were in the other car. Pettie testified he first saw Ogle Veach at the hospital. Veach asked to represent him as his attorney and later showed him a contract he had signed. At no time did Pettie ask Veach to come to see him, nor had he asked his doctor to recommend a lawyer.

Lee Pierce testified he first met respondent at the hospital, and was told that Dr. Weathers had sent him. Veach told him he had seen Pettie, and hence he also hired respondent and signed a contract.

Griffin Suggs met Veach at the hospital when he came to see him. He had never heard of Veach before, and had not asked to see an attorney. Veach told him he represented Pettie and Pierce, so he hired him also.

Respondent claims that Dr. H. H. Weathers, who was not produced, called him and said Pettie, Pierce, and Suggs wished to see him, and that he talked to Yurkiv only after being employed by Pettie, Pierce, and Suggs and then only to get his view of the accident.

In support of count 6 the record discloses that Bobbie Brewer was injured in an accident and confined to the hospital at Scott Field. Veach came to see him, exhibited photostats of checks received in cases he had handled and received an O.K. to handle Brewer's case on the ground that Brewer would be put to no expense. A few days later he had Brewer sign a contract. Later Veach dropped the case when Brewer failed to go in for some depositions and returned the signature torn from the contract. Brewer did not know Veach prior to the time he called on him, and he had not asked anyone to send a lawyer to see him. Respondent claimed that Frank Runyan, whom he also represented, told him Brewer wished to see him. When Runyan appeared as a witness no questions were asked to have him corroborate the respondent.

In support of count 7 the record discloses that Lucy Davis was injured while riding on a bus, and reported to her doctor, Dr. Silas Woods, for treatment. A week or so after the accident Ogle Veach, whom she had never before seen, came to her home. She had asked no one to send her an attorney. He told her Dr. Woods sent him. He returned a second time and told her he could do her some good and recounted other instances where he obtained recoveries. After several trips to her home she finally signed a contract. Respondent stated that Dr. S. S. Woods called him and said Lucy Davis wished to see him. The doctor called her in his presence, made an appointment, and he went to see her. Dr. Woods did not appear as a witness to corroborate the respondent.

In support of count 8 the record shows that on April 23, 1950, Alexander Martinez, a resident of East St. Louis,

was injured in an automobile accident on U.S. highway 40 in Fairmount City, Illinois. George Conran was with him at the time and was injured. The respondent saw George at the filling station, which was operated by him, and asked to represent him. The respondent also requested that Conran accompany him to see the other injured people, which he did. They also signed a contract of employment. On cross-examination respondent admitted he had solicited employment as an attorney from Conran.

In support of count 10 the record discloses that Henry F. Bartels, a resident of Wood River, Illinois, was struck by an automobile and killed on July 2, 1944, at Alton. A few days after the funeral respondent appeared at the home of Minnie Bartels, widow of the deceased. She had not seen or heard of him before that time and had not consulted a lawyer up to that time nor had she asked anyone to send Veach to her. Respondent asked Mrs. Bartels to employ him or Harold J. Bandy, a lawyer practicing in Madison and St. Clair counties. On cross-examination respondent admitted that he talked to Mrs. Bartels and told her Bandy wanted to represent her in the matter. Bandy did appear as Mrs. Bartels' lawyer and Bandy paid Veach $150 for his services in the case.

In support of count 11 the record shows that Lester Drake was injured in an automobile accident on June 18, 1950, near Edwardsville, Illinois. A man, who said he was Ogle Veach came to his home and told him he thought he could get him some money. He left his business card with him. Kathy Drake, wife of Lester Drake, was injured in said accident. She stated that a man calling himself Ogle Veach came to their home and told her he had looked into the case history and that they should file suit and get something out of it. At the hearing, Veach was asked to rise and Mrs. Drake was able to recognize him as the man with whom she had talked. Respondent denied what Kathy Drake said and claimed the card she had was one of his,

but that the writing on the back was not his. Kathy Drake testified further she never heard of Ogle Veach prior to that day.

The facts further show, and the Commissioners so found, that respondent carried with him a supply of employment contracts, that he had the habit of giving to his ex-clients several of his professional cards, and that the evidence shows the respondent to be guilty of all counts from one to eleven, as set forth in the complaint, with the exception of count 9 and as to that part of count 2 charging the respondent with having sought to procure a false witness.

The record in this case evidences conclusively a career of active and repeated solicitation of personal injury business by respondent. There are, to be sure, slight inconsistencies in the testimony of several witness as pointed out by respondent. None of these inconsistencies is sufficient, however, to refute the evidence of solicitation contained within the testimony of such witness. Much of the evidence of solicitation is corroborated by other witnesses. To counter this lengthy, uniform and compelling evidence of solicitation produced from numerous essentially disinterested persons, the respondent offers only his own testimony, and which, if true, was largely susceptible to corroboration. Certainly, the testimony of so many disinterested witnesses who had nothing to do with the prosecution of this inquiry, most of whom professed satisfaction with respondent's services, is more worthy of belief than the unsupported denials and feeble explanations of respondent.

Relying on the case of *In re Donaghy*, 402 Ill. 120, the respondent contends that while the courts owe a duty to protect the public from impositions and improper practices of the legal profession, such duty, and the manner in which it is exercised, must not be despotic, but the charges must be shown to have been fraudulent and the result of improper motives, and the proof must show intent. This pro-

nouncement is taken from those cases involving fraudulent practices or deceit of clients or court. It is evident that every type of misconduct in which attorneys may engage does not involve fraud or deceit. Many of the practices prohibited by the canons of ethics do not inherently involve fraud or deceit, but are nevertheless reprehensible. Instances of solicitation will rarely, though they sometimes may, involve either the element of fraud or deceit. Lack of such element does not render the act any the less reprehensive, nor does it serve to promote the good reputation of the bar. The evidence of repeated and active solicitation of personal injury business by this respondent rules out the possibility of mere carelessness or mistaken judgment on his part. It indicates a planned and intentional mode of operation.

It is provided by the 28th of the Canons of Professional Ethics of the Illinois State Bar Association as revised and adopted June 4, 1938, that:

"It is unprofessional for a lawyer to volunteer advice to bring a lawsuit, except in rare cases where ties of blood, relationship or trust make it his duty to do so. Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable to hunt up defects in titles or other causes of action and inform thereof in order to be employed to bring suit or collect judgment, or to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office or to remunerate policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services. A duty to the public and to the pro-

fession devolves upon every member of the Bar, having knowledge of such practices upon the part of any practitioner, immediately to inform thereof to the end that the offender may be disbarred."

The practices engaged in by this respondent are in each instance completely contrary to the language and dictates of Canon 28. "Solicitation of business by an *attorney, even where it is in aid of the interest of his client,* is a delicate matter and must be conducted with great circumspection and regard for the proprieties of the situation. The motives of the attorney must be apparently fair and his conduct must be above board and without misrepresentation or deceit." (*People ex rel. Chicago Bar Assn.* v. *Ashton,* 347 Ill. 570.) In that case the attorney was suspended from practice for one year for unwarranted solicitation in aid of other clients. Here the solicitation by respondent was not in any manner in aid of the interests of other clients. This was a bald plan of promotion for his own legal business—strictly prohibited by the Canons of Professional Ethics.

We have many times recognized that the disbarment of an attorney is the destruction of his professional life, his character, and his livelihood. Likewise, the removal of an attorney from practice for a period of years entails the complete loss of clientele with its consequent uphill road of patient waiting to again re-establish himself in the eyes of the public, the courts and his fellow lawyers. However, the courts should not hesitate to inflict the penalty where the punishment is fully deserved. (*In re Donaghy.*) Some infractions of the Criminal Code are more serious than others and call for a much higher grade of punishment, and so it is with infractions of the canons of ethics. The offense of solicitation of business is not one which imports venality, criminality, fraudulent practices or moral turpitude. (*People ex rel. Chicago Bar Assn.* v. *McCallum,* 341 Ill. 578.) Nevertheless, its practice is inimical to the

good reputation of the bar in general, is strictly prohibited and studiously to be avoided. While the courts of Illinois have never before, so far as we can determine, disbarred an attorney for solicitation alone, a review of those cases where solicitation was charged indicates that proof was there made of only one or two questionable acts. The record here establishes a constant and repeated effort at improper solicitation by respondent, and a complete disregard of the canons of ethics by which our profession is governed. We cannot permit such improper conduct to continue unchecked or remain uncensured. No fraud, criminality, or deceit being here involved, we do not believe that disbarment is in order. Respondent, however, is fully deserving of some severe disciplinary action. We, therefore, accordingly suspend the respondent from practice as an attorney for five years.

*Respondent suspended.*