(No. 33921.—

*In re* SAUL E. COHN, Attorney, Respondent.

*Opinion filed November 26, 1956—Rehearing denied Jan. 23, 1957.*

SCHAEFER and DAVIS, JJ., dissenting.
BRISTOW, J., specially concurring on rehearing.

REYNOLDS M. EVERETT, of Galva, and DUANE L. TRAYNOR, of Springfield, *amici curiae*.

DAN McGLYNN, R. E. COSTELLO, and STANFORD S. MEYER, all of East St. Louis, for respondent.

Mr. CHIEF JUSTICE KLINGBIEL delivered the opinion of the court:

This is a disciplinary proceeding brought against Saul E. Cohn, an attorney at law, pursuant to Rule 59. (Ill. Rev. Stat. 1955, chap. 110, par. 101.59.) It was begun on October 30, 1954, with a complaint by the inquiry division of the committee on grievances of the Illinois State Bar Association, charging respondent with unprofessional conduct in soliciting personal injury cases. After consider-

ing evidence the board of governors as commissioners of this court made their report finding 24 instances of solicitation, 13 of which are not disputed by respondent. The commissioners recommend that respondent be suspended from practice for a period of five years. Respondent has filed exceptions to the report.

Respondent was admitted to the bar in 1933 and practices in East St. Louis, where he has resided all his life. In 1950 he employed one Albert Toler as investigator, at a salary of $75 per week. A few months after this employment began, Toler engaged upon a course of active solicitation of personal injury business for respondent. He would acquire knowledge of accidents through newspaper reports or other sources, promptly call upon the injured person, or the family in cases of death, going either to the hospital or to the home, ascertain if counsel were desired, and suggest the name of respondent. Contracts of employment would be secured by Toler on forms carried for the purpose, whereupon respondent would immediately send a lien letter to the defendant involved. The record discloses a substantial number of such instances, wherein injured persons were approached by Toler and employment contracts obtained in this manner, but it would serve no useful purpose to relate them here. While respondent insists he engaged Toler only as an investigator and was at first unaware of his soliciting activities, it is admitted that he later learned of it and took no steps to discontinue the practice until 1953. In that year Toler's activities engaged the attention of an organization of young lawyers known as "The Younger Members of the East St. Louis Bar Association." This group caused an information to be filed against Toler charging him with unauthorized practice of law; and an injunction was secured restraining him from soliciting law business for himself or others. When respondent learned of this action by the lawyers' group he discharged Toler.

There is no material dispute concerning the evidence. Respondent does not deny that he engaged in improper solicitation through this agent for a substantial period of time. He testified that he understood the unethical nature of solicitation; that he made a mistake; and that he will not in the future engage in such practices. The record shows that he fully co-operated with counsel for the committee, furnishing exhibits and copies of documents from his files and entering into stipulations of fact which considerably shortened and facilitated these proceedings. Twenty-nine members of the bar, including five judges, appeared as character witnesses on respondent's behalf. They testified to his good reputation and his fairness and integrity in his dealings with courts and fellow lawyers. It appears from such testimony that respondent had been active in bar association work, that he is an able lawyer, that he always kept his word, and that he enjoys a good reputation for truth and honesty.

It is urged on his behalf that in view of his frankness, his reputation, and the fact that no clients have expressed dissatisfaction with his services or complained of over-reaching, his one episode of transgression is not a true representation of his character and does not show him to be unfit to continue the practice of law; that suspension for five years would be equivalent to a destruction of his livelihood; and that since he has changed his attitude, acknowledged his error and given assurance that no repetition of the misconduct will occur, the interests of the profession would be adequately protected with a censure by this court. We are thus presented with the sole question of what discipline is warranted for undisputed solicitation, under the circumstances shown in this record.

The practice of solicitation, as exemplified in this case, is one of the most serious problems confronting the profession. It is condemned by the canons of ethics of every bar association, and yet some lawyers persistently engage

in such improper conduct, bringing the entire profession into disrepute. The evils of so-called "ambulance chasing" are well known, and have been made the object of repeated criticism in our courts and elsewhere. (See *Morris* v. *Pennsylvania Railroad Co.* 10 Ill. App.2d 24.) The disreputable behavior of respondent in the case at bar cannot be attributed to mere carelessness or ignorance of ethical standards. By his own admission he knew the reprehensible nature of the practice, and yet deliberately continued it. Such misconduct deserves nothing but contempt in the eyes of judges, lawyers and the public generally. It cannot be condoned. Since respondent is unquestionably guilty of unprofessional behavior tending to bring the courts and the profession into disrepute, we hereby severely reprimand and censure him.

While the solicitation of law business is highly reprehensible and improper, it is not an offense which imports venality, fraudulent practices, or moral turpitude. (*In re Veach,* 1 Ill.2d 264, 273.) Like the various offenses under the criminal code, some of which are more serious than others and call for a higher grade of punishment, the various infractions of professional ethics afford differing indications of unfitness for the practice of law. (See *In re Veach,* 1 Ill.2d 264, 273.) A disbarment proceeding is not a prosecution for crime. Its purpose is to ascertain whether the person concerning whom the proceedings are brought is unfit to remain an attorney. (*In re Goldstein,* 411 Ill. 360.) While a lawyer may properly employ an investigator to discover facts concerning a case in which he is retained, it has been held clearly unprofessional to permit him to carry signed contract forms which he procures to be signed by injured parties before conferring with the attorney. (*In re Mitgang,* 385 Ill. 311.) In that case we censured the attorney for engaging in such an impropriety, but in view of the evidence of good reputation and the absence of any fraud or overreaching of clients,

we concluded the conduct did not warrant disbarment or suspension.

We have recognized that disbarment or suspension may destroy an attorney's livelihood (*In re Donaghy,* 402 Ill. 120,) and that each case of this character must be considered on its own merits. (*In re Smith,* 365 Ill. 11.) Respondent here had offered extensive evidence of his good reputation for truth and professional standing among his associates and judges before whom he practiced. He discontinued his misconduct prior to the initiation of these proceedings. He has given his solemn assurance that he will in the future observe the ethics of his profession, and his sincerity appears evident in the fact that he testified, openly confessed his error, and has maintained an attitude of co-operation with the committee in its investigation. He did not attempt to obstruct the proceedings, nor does he indulge in abuse and recrimination against those responsible for instituting them. In view of the circumstances present in this case, and respondent's evident reformation, we do not consider that his past transgression of professional propriety justifies his suspension as an attorney. His acts are by no means condoned, however. Because of them respondent is deserving of severe censure, and any resumption of such practices will result in his disbarment.

*Respondent censured.*

Mr. JUSTICE SCHAEFER, dissenting:

Guilt is admitted in this case, and the only question is the discipline to be imposed. The committee on grievances of the Illinois State Bar Association recommended disbarment. The Board of Governors of the Association recommended suspension for 5 years. Mr. Justice Davis and I feel that the censure that this court now imposes is inadequate.

What the opinion of the court euphemistically describes as "one episode of transgression" was actually a deliberate

192

course of solicitation that lasted over three years. During that period respondent collected more than $41,000 in fees in cases that were solicited by the runner he hired. This profitable "episode" continued until the younger lawyers of the area sought an injunction to restrain his activities. That respondent did not "overreach" his clients, or defraud them, does not seem to us particularly relevant. He overreached the other members of the bar to a degree that forced upon them the disagreeable job of bringing suit to put a stop to his activities.

Censure misses the mark in a case like this one. Respondent deliberately and systematically solicited business to make money. He succeeded. If we assume that censure will keep him from resuming operations, there are others who might be quite willing to choose a certain and substantial present profit against the risk that if their activities are discovered the consequence will be a formal censure buried in the reports of this court.

Mr. JUSTICE DAVIS concurs in this dissent.

Mr. JUSTICE BRISTOW, specially concurring with the majority opinion, on consideration of a petition for rehearing:

The petition for rehearing filed by our commissioners wherein it is stated that the majority opinion herein "shocks the conscience of the Bar of the State of Illinois" bestirs the necessary enterprise required to put a few observations in writing.

I have caused to be canvassed all of the disciplinary cases in all States covering a period of the last two years. I have found not one case involving simple solicitation, unaccompanied by venality or moral turpitude, under circumstances comparable to those appearing in this record, where the punishment has exceeded censure.

The case that heads the list of authorities relied upon by the Bar Association is *In re Veach,* 1 Ill.2d 264. Veach,

who was suspended for five years, was not only a menace to the bar, but to the public generally. He was a chaser himself, pursuing injured victims and wresting from them a contract of employment almost before they had regained consciousness. He had no office, was not a trial lawyer, settled his cases in package lots for much less than their real value, thus betraying a client rather than representing him. When his case was heard not a single lawyer in his area testified in his behalf.

The second case relied upon is *People ex rel. Chicago Bar Association* v. *Ashton,* 347 Ill. 570. Therein the respondent Ashton was suspended for one year, not because of solicitation alone, but because of the use of fraudulent letters.

Then, there is cited *Atchison, Topeka & Santa Fe Railway Co.* v. *Andrews,* 338 Ill. App. 552. The respondent therein was so notoriously involved in "ambulance chasing" on such a huge scale that he finally surrendered, requesting that his name be stricken from the roll of Illinois attorneys.

In the case of *State ex rel. Oklahoma Bar Association* v. *Hatcher,* 209 P.2d 873 (1949), the offender was suspended for three years. He was associated with two others. The three had runners all over the State of Oklahoma, ambulance drivers, cab drivers, coroners, doctors, internes and hospitals. In a period of a few years they processed several thousand workmen's compensation and personal injury cases. I am amazed that we should be asked to reconsider our opinion and that reliance for such request be predicated upon the foregoing authorities.

In the instant case respondent was admittedly guilty of a series of solicitations. The personal injury cases of East St. Louis were being channelled by "ambulance chasers" into the offices of St. Louis attorneys. The respondent hired one of the better solicitors, Albert Toler, and acquired some of the business that otherwise would have gone across the river. The more aggravated cases of solicitation that appear

in our reports invariably involve fee splitting, the procurer receiving a substantial percentage of the recovery. The record in this case shows that with the exception of two occasions, Toler received only his regular monthly salary, and that the respondent never split fees with Toler. The commissioners so found.

I am deeply impressed with the unanimity with which the members of the East St. Louis Bar Association testified on behalf of the respondent's integrity, and the fidelity and effectiveness with which he handled the business of his clients. Also of significance is the fact that two of the finest lawyers in that area appeared in our court, without compensation, and with feeling and eloquence spoke in behalf of the respondent. The commissioners, nevertheless, recommended that this person be given the same punishment as Veach. This would be tantamount to a destruction of respondent's professional life.

In cases in which professional impropriety not importing venality or moral turpitude, such as solicitation, is proved, or, as in this case, admitted, we do not have to determine the facts but must appraise the degree of the transgression against canons of ethics.

The solicitation of law business, whether accomplished directly by the lawyer himself or through intermediaries, is proscribed by the canons of all bar associations. Bar associations do their duty when their members bring instances of such offenses to the attention of the courts. In the instant case, younger members of the East St. Louis Bar Association, acting in uncompensated devotion to the legal profession, have pressed the charges against respondent and recommended that he be suspended for a period of five years.

Nevertheless the following considerations are important. The inhibition against the unprofessional solicitation of lawyers' business arose in England and the early days of this country when almost all litigation was either between

members of a family, neighbors, friends, close business associates, master and servant when a servant was a part of the household, or other persons united in intimate association.

Incidentally, it should be noted that the principle of professional ethics that inhibited solicitation evolved as a part of a policy that so strongly deterred any attempt to "stir up litigation" as to forbid contingent fees in any kind of case. Such fees are still forbidden in England but are approved in every State of the Union.

Today insurance companies, railroads, airlines and other industries in whose operation some people are certain to be maimed or killed have highly organized mechanisms of defense. Claim agents, many of whom are not lawyers, do their simple duty when they try by fair means to obtain the lowest possible settlement for injured plaintiffs. Instances in which claim agents resort to unfair means range from cases in which the agent exerts excessive zeal to cases of shocking fraud. Even the most scrupulous claim agent cannot fairly represent both claimant and defendant. In any event, claim agents cannot hope to achieve advancement by affecting liberal settlements with claimants.

On the other side we find some overzealous "chasers," equipped with newspaper clippings, photostats of large settlement checks and other documentary evidence indicating that the lawyer they are representing is a "superman" never satisfied with anything short of six figures. It is a veritable scramble between the claim agent and the "chaser" to see which one can reach an injured claimant first. The net result of a timely arrival of the solicitor is that the claimant will eventually receive an amount that a court and jury deems adequate and just. This presupposes that the case is placed in the hands of a lawyer of proven ability and unquestioned fidelity. The uncontradicted proof in this record demonstrates that respondent was such a person. Apart from the good, the only tangible harm that evolved from

the solicitation in the instant case is that suffered by the St. Louis barrister who had a portion of his business sidetracked. I am not overlooking the impact of this ugly practice of our fine profession. Nevertheless, solicitation of personal injury cases is the natural reflex or defensive response to the unfair methods of claim adjusters, just as naturally as the human organism elaborates its own antibodies to combat disease.

Nor is it amiss to note that opulent lawyers and large law firms who do not employ "runners" to attract business do spend large sums of money for memberships in country clubs, entertainment in fashionable surroundings and other similar amenities of social intercourse. That the primary purpose of these expenditures is the attraction of law business and not hospitality is attested by the fact that such lawyers regularly claim and the Internal Revenue Department regularly allows deductions for these expenditures as "business" and not "personal" expenses. I do not disapprove of this practice. It is not only a dignified method of solicitation that is generally recognized, but it has the unique advantage of having the United States government pay a substantial portion of its cost. Of course, there is a difference in the two forms of solicitation. It seems unrealistic to say that there is such a spread between the two forms that one deserves sanction and the other professional interment.

While we are considering the sins of our profession, we should not fail to pay our respects to the most reprehensible of all, namely the lawyer who finds it convenient to simulate mourning and solicitude in the presence of a bereaved family when an estate is to be settled. Then there is the lawyer who contributes money in political campaigns that he might receive the appointment as city attorney or perhaps assistant State's Attorney. Is this an overreaching of the other lawyers in this area?

For a quarter of a century Saul E. Cohn and his wife have enjoyed an unblemished reputation in East St. Louis for being good people. These proceedings necessarily have brought to them and their two children humiliation and distress. This court's judgment of censure is a real, substantial and serious punishment for any self-respecting lawyer. It constitutes a punishment that all members of the bar worthy of the name of lawyer would avoid. Judge Cardozo, while a member of the Court of Appeals of New York, in the case of *People ex rel. Karlin* v. *Culkin,* 248 N.Y. 465, 162 N.E. 487, 60 A.L.R. 851 (1928), involving the investigation of a lawyer's conduct, had this to say: "The argument is pressed that, in conceding to the court a power of inquisition, we put into its hands a weapon whereby the fair fame of a lawyer, however innocent of wrong, is at the mercy of the tongue of ignorance or malice. Reputation in such a calling is a plant of tender growth, and its bloom, once lost, is not easily restored. The mere summons to appear at such a hearing and make report as to one's conduct may become a slur and a reproach." Reprimand and censure have been found to be effective vehicles of punishment in the disciplinary proceedings in the U. S. Army. If this were a criminal proceeding and the respondent should request probation, under the circumstances of this case, it is inconceivable that any court would refuse.

It is my hope that these reflections may afford some relief to the authors of the petition for rehearing who asserted that the determination implicit in the majority opinion produced shock. It is to be noted that the Junior Bar Association of East St. Louis refused to join in the petition for rehearing.

With these observations I concur in the judgment of censure.