CHAPMAN & CHAPMAN, CHARTERED, Petitioner-Appellee, *v.* WILLIAM D. RHOADES *et al.*, Respondents-Appellants.

Fifth District   No. 77-442

Opinion filed December 18, 1978.

G. MORAN, P. J., dissenting.

Thomas W. Alvey, Jr., and William A. Schmitt, both of Pope and Driemeyer, of Belleville, for appellants.

Chapman & Chapman, Chartered, of Granite City (Terrence V. O'Leary, of counsel), for appellee.

Mr. JUSTICE FRIEDMAN delivered the opinion of the court:

This action was brought upon an attorney's lien properly preserved under section 1 of "An Act creating attorney's lien and for enforcement of same" (Ill. Rev. Stat. 1975, ch. 13, par. 14) to recover attorney's fees allegedly due under a contingent fee contract entered into between the petitioner, Chapman & Chapman, a law firm in Granite City, Illinois, and respondent, William D. Rhoades, that firm's putative client. The trial court awarded judgment for the law firm in the amount requested, and defendants appeal. The Norfolk and Western Railway Company is involved as a party defendant because it has paid a personal injury settlement to Rhoades against which the attorney's lien is asserted.

On January 11, 1976, while in the employ of the Norfolk and Western Railway Company, the defendant sustained a knee injury. On February 12, 1976, Rhoades telephoned the offices of Chapman & Chapman and explained that he was considering filing suit against the railroad and requested that someone from the law firm come to his home to consult with him about his claim. Robert Chapman, an investigator for the law firm, went to Rhoades' home to speak with him. Robert Chapman was a self-employed legal investigator with his office in the offices of Chapman & Chapman. Robert Chapman discussed the circumstances of the injury with Rhoades and his wife and voiced his opinion that Rhoades' claim was valid and worth a fairly large amount of money. Robert Chapman then produced a form contract employing the law firm of Chapman & Chapman which Rhoades signed, authorizing that firm to represent him in a lawsuit against the railroad.

This contract is in evidence and provides that the law firm was retained by Rhoades for the purpose of filing suit against the Norfolk and Western Railway Company to recover for the injury sustained by Rhoades. The contract blanks were filled in by Robert Chapman and provided that the law firm was to be paid 25 percent of any recovery. Robert Chapman initialed the contract "MBC" in the blank provided for the law firm's acceptance of the retainer agreement. These initials were apparently intended to be those of the senior member of the law firm, Morris B. Chapman. At the time the retainer agreement was executed, Rhoades orally specified that suit was not to be filed until after he returned to work as his ultimate level of disability was in considerable doubt.

Robert Chapman returned to the offices of the law firm and delivered the executed retainer agreement to them. That same evening, Mr. and Mrs. Rhoades decided to reverse their decision to sue the railroad and the

next morning telephoned Robert Chapman to tell him of that decision. Mrs. Rhoades testified that she made the call and Robert Chapman said that he would tear up the contract. This point is denied by Chapman.

The law firm proceeded to file a complaint for Rhoades resulting in complaints by the Rhoadeses to the firm that their instructions had not been followed. On February 17, 1976, the same day suit was filed, the law firm asserted an attorney's lien by delivering a declaration of lien with the railroad. On March 1, 1976, the Rhoadeses sent a certified letter to the law firm ordering that the litigation be dismissed. A motion to dismiss the suit was granted by the trial court on March 4, 1976. Subsequently, Rhoades and the railroad agreed to a settlement, and it is against this fund that the action for attorney's fees is brought.

The trial court's dismissal of the Roades' complaint on March 4, 1976, specifically reserved jurisdiction to enforce any claim for attorney's lien on behalf of the law firm. Following the filing of a petition and answer, judgment for the law firm in the amount of $3,750 was entered against the railroad and Rhoades by the trial court on July 8, 1977. This appeal followed. We reverse.

Judgment was rendered below on the basis of the attorney's lien filed by the law firm. The defendants opposed the enforcement of the lien below, and in this court, upon several theories, but we need only address one of them.

Section 1 of an Act entitled "An Act to prohibit the solicitation of legal business * * *" (Ill. Rev. Stat. 1975, ch. 13, par. 15) provides that:

> "It shall be unlawful for any person not an attorney at law to solicit for money, fee, commission, or other remuneration directly or indirectly in any manner whatsoever, any demand or claim for personal injuries or for death for the purpose of having an action brought thereon, or for the purpose of settling the same."

Section 3 of the same act (Ill. Rev. Stat. 1975, ch. 13, par. 17) provides that "[a]ny contract of employment of an attorney obtained or made as a result of a violation of this Act shall be void and unenforceable." It is agreed that if the activities of Robert Chapman here constituted solicitation within the provisions of section 1, the contract upon which this action is brought is void and unenforceable as a matter of law under section 3.

Solicitation has been defined as:

> "1. The pursuit, practice, act or an instance of soliciting; often, specif., and entreaty; importunity; as, to yield to his *solicitations*.
>
> 2. The operation, influence, pressure, etc., of that which solicits or attracts or draws; moving or drawing force; incitement; allurement; as, to resist the *solicitations* of an appetite for drink." (Webster's New International Dictionary (2d ed. 1941).)

From the bare definition of the word it is difficult to gauge whether Robert Chapman's actions here amounted to solicitation. The petitioners argue that solicitation in this instance was impossible because the Rhoadeses initiated contact with the law firm by calling to say they were thinking about suing the railroad. Because Rhoades could not travel to the office of the law firm, Robert Chapman went to his house. We do not accept the law firm's contention that solicitation was impossible under these circumstances.

What is central in determining whether solicitation has occurred is the activity of the solicitor after his arrival at the home of the person being solicited. Here, it is important to note that after obtaining a statement of the circumstances of the injury to Rhoades, Robert Chapman voiced his opinion that Rhoades had a valid claim against the railroad and that his claim was worth a lot of money. According to the depositions of all parties, the next thing that occurred was the removal of a form contract employing the law firm of Chapman & Chapman from Robert Chapman's briefcase. Under these circumstances we cannot characterize the contact made by Robert Chapman as anything other than solicitation.

We also note that the activities of Robert Chapman here are not unlike those censured by the Illinois Supreme Court in *In re Cohn* (1956), 10 Ill. 2d 186, 139 N.E.2d 301, and *In re Mitgang* (1944), 385 Ill. 311, 52 N.E.2d 807. While both of these cases involve disbarment of the attorney for whom a solicitor was directly working, and there is no evidence that Robert Chapman was employed by the law firm of Chapman & Chapman to solicit clients, in both instances the court found solicitation to have occurred. That the opportunity for solicitation arose from Rhoades' telephone inquiry rather than from a more direct approach by the investigator does not sufficiently distinguish the characterization made by the supreme court. Had Mr. Chapman gone to the Rhoades home only to investigate the facts surrounding Rhoades' claim against the railroad or to give him any information he may have requested, a different question may have been presented. But Robert Chapman gave opinions as to the validity of a claim, characterized the claim as being valuable, and carried form contracts of the law firm—with which he had no ostensible association—in his brief case ready for execution.

Under the facts of this case, we cannot but say that solicitation occurred in violation of section 1 of "An Act to prohibit the solicitation of legal business for remuneration and to provide a penalty therefor" (Ill. Rev. Stat. 1975, ch. 13, par. 15) and that therefore this contract was void and unenforceable. The judgment of the trial court is accordingly reversed.

JONES, J., concurs.

Mr. PRESIDING JUSTICE GEORGE J. MORAN, dissenting:

The majority holds that Robert Chapman induced William D. Rhoades to enter into the contract in question by giving him legal advice. In arriving at this decision it says:

"Robert Chapman discussed the circumstances of the injury with Rhoades and his wife and voiced his opinion that Rhoades' claim was valid and worth a fairly large amount of money. Robert Chapman then produced a form contract employing the law firm of Chapman & Chapman which Rhoades signed, authorizing that firm to represent him in a lawsuit against the railroad."

This conclusion is not justified by a fair reading of the evidence on this question. I therefore deem it necessary to quote all the testimony in the record bearing on this question.

Three witnesses testified concerning what transpired when this contract was entered into, namely, William D. Rhoades, one of the appellants in this cause, Joanne Rhoades, his wife, and Robert Chapman.

William D. Rhoades' testimony in pertinent part reads:

"Q. Now did you eventually contact someone from the firm of Chapman & Chapman?
A. Yes, I did.
Q. Did you call the firm?
A. Yes, I did.
Q. Do you know who you spoke with the first time you called?
A. Bob Chapman.
Q. And what was the date of that conversation, do you recall that?
A. No, I don't recall the exact date.
Q. Did you, at the time you called, the first, did you invite Mr. Chapman to come over to your Home?
A. Yes, I did.
Q. And did he come the same day that you had called him or was it a day or two later?
A. No, it was a day or so later.

* * *

Q. And who was present during the time you discussed our representing you with Bob Chapman?
A. My wife.
Q. Just the three of you?
A. Yes.
Q. During the course of that conversation did you sign a contract authorizing our firm to represent you?
A. Yes, I did.

Q. And were you told we would then proceed to file a claim on your behalf in the court over in Madison County?

A. Yes.

Q. What else did you discuss other than the fact that we would institute a claim on your behalf?

A. Well, I signed the contract with Chapman on the condition that it would not be filed until I had returned to work and Bob Chapman said at the time, 'Fine.' I was supposed to call him either to file it or not to file it.

Q. What was the reason that you were insisting upon that stipulation?

A. Well, due to the nature of the injury I could either walk as well as before or end up using crutches.

Q. Did you know the extent of your injury at that time?

A. No, I did not.

Q. Had you been told that you had a cartilage injury to your knee?

A. I didn't know that until a few days later.

Q. As of that date did you have an anticipated date that you would be able to return to work?

A. No.

Q. What else was discussed other than the fact that you did not want the claim to be filed until such time as you had returned to work?

A. That was all that was discussed.

Q. Had the terms of the contract been explained to you?

A. Yes.

\* \* \*

Q. How long was Bob there?

A. Maybe a half hour.

Q. Did you and Bob make any arrangements to conduct any investigation of your case at that time?

A. Well, he was supposed to return the following morning to go down to take some pictures of the area where the accident occurred and he did not show up.

Q. Did you make plans to do any other kind of investigation other than taking pictures the next day?

A. No, none.

Q. Would it be fair to state then that the—strike that. Were the only things discussed during the meeting with Bob the facts surrounding the contracts which you understood how it worked, the fact you did not want us to file it until you returned to work plus the plan to take the pictures the following morning?

A. Right.

Q. And that's it?

A. That's it.

\* \* \*

Q. You had apparently wanted to sue them earlier that day when you called for us to come over and you changed your mind?

A. Well, I called them more or less for advice.

Q. Did you—did Bob give you any advice in that regard?

A. No, not really.

Q. Did you—would you have actually asked him if you should file a claim?

A. I did ask him and he said yes.

Q. So he did then give you some advice?

A. Well, yeah.

Q. Were there any questions you asked him that he didn't answer at that time?

A. Yes, there are.

Q. What were those questions he didn't answer?

A. I don't recall right now but I do know there was at least two that he would answer around them but he would never give me a direct answer to them.

Q. Do you recall what that was in regard to?

A. One was in regard to the amount and the other one I don't recall exactly what it was.

Q. Had you asked him what your claim was worth?

A. Uh, huh.

Q. And what type of answer did he give you on that?

A. He just said a fairly large amount. He wouldn't say.

Q. Did he mention any figure at all?

A. No.

Q. Did he give you an exact figure?

A. None.

Q. All right. Do you recall any other question that you had that he was not able to give you an answer for?

A. No, I don't."

Joanne Rhoades' testimony in pertinent part reads:

"Q. Mrs. Rhoades we have previously taken a deposition of your husband in this matter and he has indicated that at the time he signed the contract with our office to represent his interests in a claim against the Norfolk & Western Railway Company that you were present at that time, is that correct?

A. Right.

Q. And also present at that time was Mr. Robert Chapman from our office?

A. Bob, yeah.

Q. And was anyone else there?

A. No, not at the time we were talking to Bob Chapman, no.

\* \* \*

Q. Had Bob explained the terms of the contract to him and to yourself?

A. He told Bill to read the contract.

Q. All right. Then did he answer any questions that Bill had about the contract?

A. Bill didn't have any.

Q. He understood it as far as you know?

A. Yeah.

Q. And at that time he signed the contract there wasn't anybody coercing him to do it. He was willing to do it, is that correct.

A. Yeah.

Q. You didn't—did you have any objection to him signing the contract at that time?

A. No.

Q. It was with your approval?

A. Uh, huh."

Robert Chapman's testimony in pertinent part reads:

"Q. And would you tell me what he said to you and what you said to him?

A. Well, he said that, you know, he had sustained an injury, and that he wanted to retain an attorney. And, he asked me the usual questions like, 'What is my case worth?' And, you know, 'Do you think I have a good case?' And, then we went—then I asked him to give me some of the facts and so on and so forth, the way the thing happened. And, just that sort of thing. And, then I made arrangements with him to go—I mean the next day or maybe sometime later, sometime later it was. I don't know just when it was. It wasn't that same day, to go down to the yards and take some pictures because I wasn't familiar with that yard down there. I am still not. And, I wanted to go down there and look at the yard. That's part of the purpose of my going out on those things, because I can go out immediately to the yard and see what's going on. And, you know, get the basic thing in so that there is some basis to know whether you have a lawsuit and file a claim.

Q. Okay. You talked about the facts of the accident with him. And, he asked you whether or not I guess you thought he had a good case or something like that?

A. Right.

Q. Okay. And then you made a tentative arrangement, what, the next day or so to go out and take some pictures?

A. Yes.

Q. Okay. When this conversation was going on, Bob, was his wife present there?

A. His wife was in and out. I think mostly in, but she—it seems like she went back in the kitchen or the bedroom once or twice. But she was there most of the time.

Q. Okay. At some point in time did you have a conversation with Mr. and Mrs. Rhoades about signing a contract of employment?

A. Yes. We talked about signing a contract.

Q. Okay. And what did you say to him, and what did he say to you?

A. Well, I told him that we have a contract there, and it was a twenty-five percent contingency contract. And, I explained to him in some detail. He seemed to be generally familiar with what I was talking about, and then he looked at the contract and I assume read it, and signed it.

Q. Okay. Did you explain any of the terms of it to him?

A. Yes, I explained some of the terms to him, sure."

The majority concludes that Robert Chapman talked Rhoades into entering into a contract by giving him legal advice. This conclusion is not justified by the record. I therefore dissent.