(No. 51678

WILLIAM D. RHOADES *et al.* v. NORFOLK AND WESTERN RAILWAY COMPANY *et al.*, Appellees (Chapman and Chapman, Chartered, Appellant).

*Opinion filed October 19, 1979.*

Leonard M. Ring, of Chicago, for appellant.

Pope and Driemeyer, Thomas W. Alvey, Jr., and William A. Schmitt, of Belleville, for appellees.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

This appeal involves an action to recover attorney's fees allegedly due under a contingent-fee contract entered into between Chapman and Chapman, a law firm in Granite City, and William D. Rhoades, an employee of the Norfolk and Western Railway Company. The Norfolk and Western was named a party defendant because it paid a personal injury settlement to Rhoades against which the Chapman firm asserted an attorney's lien under section 1 of "An Act creating attorney's lien and for enforcement of same" (Ill. Rev. Stat. 1975, ch. 13, par. 14).

On January 11, 1976, Rhoades sustained a knee injury while in the employ of the Norfolk and Western Railway Company. On February 12, 1976, Rhoades telephoned the law offices of Chapman and Chapman, explained that he was considering filing suit against the railroad, and requested that someone from the law firm come to his home to discuss his claim.

Robert Chapman, an investigator used by the law firm, went out to the Rhoades home. Chapman was a self-employed legal investigator who had his office in the offices of the Chapman firm; he was not an attorney. On his way into the Rhoades home, Chapman met and exchanged greetings with Stanley Horton, the claim agent for the railroad assigned to the Rhoades case. Horton had dropped off a $200 advancement for Rhoades and was leaving the house when Chapman arrived. Rhoades' and Horton's testimony indicated that Horton did not know that Rhoades had contacted a law firm. Horton left for a two-week vacation to Florida the following day.

Robert Chapman discussed the circumstances of the injury with Rhoades and his wife. In response to questions, Chapman voiced his opinion that the Rhoades' claim was valid and worth a fairly large amount of money. Despite Rhoades' urging, Chapman refused to place a dollar value on the claim. After this discussion, Chapman produced a

form retainer contract of the Chapman law firm and filled in the blanks in the form. The contract authorized the firm to represent Rhoades in his personal injury claim against the railroad and provided for a 25% contingent fee.

Rhoades reviewed the retainer agreement, asked no questions about it, and signed it. Robert Chapman initialed the contract "MBC" in the blank provided for the law firm's acceptance of the retainer agreement. These initials were apparently intended to be those of the senior member of the law firm, Morris B. Chapman. At the time the retainer agreement was executed, Rhoades orally specified that suit was not to be filed until after he returned to work since his ultimate level of disability was not yet determined. Arrangements were also made for Chapman to take photographs of the area where the accident causing Rhoades' injury had occurred. Robert Chapman returned to the offices of the law firm and delivered the executed retainer to them.

The same evening the retainer was signed, Mr. and Mrs. Rhoades changed their minds and decided against suing the railroad. Rhoades testified that he had no specific reason for changing his mind. The next morning, February 13, 1976, Mrs. Rhoades called the firm to tell them of the decision not to go ahead with the suit. She spoke with Robert Chapman, who communicated that message to the Chapman firm that same day or, in any event, not later than February 14, 1976.

On February 17, 1976, the Chapman firm filed a complaint in the circuit court of Madison County in the name of William Rhoades against the railroad. On the same date, the law firm asserted an attorney's lien by delivering a declaration of lien to the railroad (Ill. Rev. Stat. 1975, ch. 13, par. 14). Also on February 17, 1976, the firm filed a motion for a temporary injunction asking the court to enjoin the railroad from interfering with the contract rights between Rhoades and his attorneys and from interfering with Rhoades' right to pursue the personal

injury action. Specifically, the motion asked that the railroad and its agents be restrained from going to Rhoades' home and from communicating with him without the firm's prior written consent. The trial court issued the temporary injunction the same day.

When Mr. and Mrs. Rhoades learned that the suit had been filed, Mrs. Rhoades called the law firm to inquire why the action had been brought contrary to their instructions. No explanation was given. Mrs. Rhoades also failed in several subsequent telephone calls to speak with Morris Chapman. On March 1, 1976, Rhoades sent a certified letter to the law firm ordering that the litigation be dismissed.

On March 4, 1976, the trial court granted the Chapman firm's motion to dismiss the suit. The dismissal specifically reserved jurisdiction to enforce any claim for attorney's lien on behalf of Chapman and Chapman.

In the early part of March 1976 Rhoades contacted Horton, the claim agent for the railroad. Horton advised Rhoades that he could not speak with him because Horton believed that Rhoades was represented by a lawyer and that the injunction was still in effect. Subsequently, Horton learned that the suit had been dismissed. Thereafter, Rhoades and the railroad agreed to a settlement of the claim for $15,000.

On February 21, 1977, Chapman and Chapman filed a petition to adjudicate attorney's fees. On July 8, 1977, the circuit court of Madison County entered a judgment for the law firm against the railroad and Rhoades in the amount of $3,750, 25% of the settlement. The railroad had agreed to indemnify Rhoades for any attorney's fees.

The appellate court reversed (67 Ill. App. 3d 1037), with one justice dissenting, on the ground that the retainer contract was the product of unlawful solicitation by a nonlawyer in violation of section 1 of "An Act to prohibit the solicitation of legal business for remuneration and to provide a penalty therefor" (Ill. Rev. Stat. 1975, ch. 13,

par. 15) and was therefore void and unenforceable (Ill. Rev. Stat. 1975, ch. 13, par. 17). We allowed the Chapman firm's petition for leave to appeal.

An analysis of the facts here and our cases convinces us that no impermissible solicitation was involved in this case.

Section 1 of "An Act to prohibit the solicitation of legal business for remuneration and to provide a penalty therefor" provides:

> "It shall be unlawful for any person not an attorney at law to solicit for money, fee, commission, or other remuneration directly or indirectly in any manner whatsoever, any demand or claim for personal injuries or for death for the purpose of having an action brought thereon, or for the purpose of settling the same." (Ill. Rev. Stat. 1975, ch. 13, par. 15.)

Section 3 declares that "[a]ny contract of employment of an attorney obtained or made as a result of a violation of this Act shall be void and unenforceable." Ill. Rev. Stat. 1975, ch. 13, par. 17.

The statute is addressed to solicitation by nonattorneys; however, the question of whether certain conduct constitutes impermissible solicitation usually arises in the context of attorney disciplinary proceedings in which attorneys are charged with soliciting cases either personally or through investigators hired to solicit cases for them. (See, *e.g., In re Teichner* (1979), 75 Ill. 2d 88, 108-09; *In re Hallett* (1974), 58 Ill. 2d 239, 244-45, 248-49.) Those cases provide guidance in determining what conduct is prohibited as solicitation under section 1 of the Act (Ill. Rev. Stat. 1975, ch. 13, par. 15). We note, however, that courts are reluctant to give a definition of solicitation which is accurate for every case; therefore, the existence of solicitation must be determined from the facts of each case. *In re Mitgang* (1944), 385 Ill. 311, 330-31.

The cases generally condemn as unlawful solicitation the drumming up or procurement of legal business by inducing potential clients who have not initiated contact

with the attorney to engage as their lawyer the attorney the solicitor recommends. (*In re Hallett* (1974), 58 Ill. 2d 239, 248-49; *In re Cohn* (1956), 10 Ill. 2d 186, 188-89; *In re Mitgang* (1944), 385 Ill. 311, 331; see also *In re Teichner* (1979), 75 Ill. 2d 88, 108-15 (conduct condemned where motive is pecuniary, not ideological).) The disciplinary rules of the American Bar Association Code of Professional Responsibility prohibit solicitation and serve as a further guide in determining what conduct constitutes solicitation. The focus of the prohibition, as in our cases, is on approaching prospective clients who have not sought the recommended attorney's legal advice and inducing those potential clients to hire that attorney. Disciplinary Rule 2—103(A) provides:

> "A lawyer shall not recommend employment, as a private practitioner, of himself *** to a non-lawyer *who has not sought his advice* regarding employment of a lawyer." (Emphasis added.) ABA Code of Professional Responsibility, Disciplinary Rule 2—103(A) (1970).

See also Illinois Code of Professional Responsibility, Disciplinary Rule 2—103(A) (1970).

In *Ohralik v. Ohio State Bar Association* (1978), 436 U.S. 447, 56 L. Ed. 2d 444, 98 S. Ct. 1912, the United States Supreme Court recently examined the evils which prohibitions against solicitation are meant to preclude. That case involved clear instances of in-person solititation by an attorney who recommended himself as an attorney to represent injured individuals who had not initiated contact with him by seeking legal advice. The issue before the court was whether the conduct could be prohibited constitutionally in light of the right to associate and to the free flow of information necessary to facilitate the expression of beliefs and ideas protected by the first and fourteenth amendments to the United States Constitution. The court concluded that the commercially motivated solicitation was not protected. In so holding the court stated:

"The substantive evils of solicitation have been stated over the years in sweeping terms: stirring up litigation, assertion of fraudulent claims, debasing the legal profession, and potential harm to the solicited client in the form of overreaching, overcharging, underrepresentation, and misrepresentation. The American Bar Association, as *amicus curiae,* defends the rule against solicitation primarily on three broad grounds: It is said that the prohibitions embodied in DR 2—103(A) and 2—104(A) serve to reduce the likelihood of overreaching and the exertion of undue influence on lay persons, to protect the privacy of individuals, and to avoid situations where the lawyer's exercise of judgment on behalf of the client will be clouded by his own pecuniary self-interest.

We need not discuss or evaluate each of these interests in detail as appellant has conceded that the State has a legitimate and indeed 'compelling' interest in preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct.' *** We agree that protection of the public from these aspects of solicitation is a legitimate and important state interest." (*Ohralik v. Ohio State Bar Association* (1978), 436 U.S. 447, 461-62, 56 L. Ed. 2d 444, 457, 98 S. Ct. 1912, 1921-22.)

The court also noted that similar problems are raised whether solicitation is by the lawyer himself or by his agent. 436 U.S. 447, 464 n.22, 56 L. Ed. 2d 444, 459 n.22, 98 S. Ct. 1912, 1923 n.22.

Robert Chapman's conduct neither fits the description of solicitation contained in our cases nor threatened the substantive evils toward which the statutory prohibition against solicitation is directed. Rhoades called Chapman

and Chapman because he was interested in suing the railroad and invited a representative of the Chapman firm to come out to his house to discuss his case. Thus Robert Chapman did not seek out a client or stir up litigation. The testimony concerning the events at Rhoades' house shows that Robert Chapman did not force representation by the Chapman firm upon Rhoades; rather, Rhoades sought information from Robert Chapman in reaching his decision whether to retain the firm to bring an action against the railroad. Robert Chapman provided only general, non-technical answers to Rhoades' questions. Under the circumstances in this case, the fact that Robert Chapman was carrying blank retainer contract forms does not indicate forbidden solicitation. There is no indication that the contract was used to implement a scheme to coerce Rhoades into retaining the Chapman firm. In sum, a fair reading of the evidence convinces us that Robert Chapman did not impermissibly solicit the retainer contract. He merely interviewed a prospective client at that client's invitation and accepted an unsolicited retainer agreement from him.

The next question we must address is whether the law firm is entitled to the 25% contigent fee provided for in the retainer agreement. The Chapman firm seeks to enforce an attorney's lien for the full amount of the contingent fee under the attorney's lien statute (Ill. Rev. Stat. 1975, ch. 13, par. 14). That statute provides:

> "Attorneys at law shall have a lien upon all claims, demands and causes of action, including all claims for unliquidated damages, *which may be placed in their hands by their clients* for suit or collection, or upon which suit or action has been instituted, for the amount of any fee which may have been agreed upon by and between such attorneys and their clients, or, in the absence of such agreement, for a reasonable fee, for the services of such attorneys rendered or to be rendered for their clients on account of such suits, claims, demands or causes of action. To enforce such lien, such attorneys shall serve

notice in writing, which service may be made by registered or certified mail, upon the party against whom their clients may have such suits, claims or causes of action, claiming such lien and stating therein the interest they have in such suits, claims, demands or causes of action. Such lien shall attach to any verdict, judgment or decree entered and to any money or property which may be recovered, on account of such suits, claims, demands or causes of action, from and after the time of service of the notice." (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 13, par. 14.)

The statute thus sets forth requirements for effective liens. The attorney must have been hired by a client to assert a claim. The attorney must then perfect the lien by serving notice in writing upon the party against whom the client has the claim. The lien attaches from and after the time of the service of the notice required by the statute. See *Baker v. Baker* (1913), 258 Ill. 418, 421; *Cazalet v. Cazalet* (1944), 322 Ill. App. 105, 107.

These requisites were not met in this case. Rhoades agreed to retain Chapman and Chapman in the afternoon of February 12, 1976. At 9 or 9:30 a.m. on February 13, 1976, Rhoades informed the firm not to file suit because he had changed his mind. The notice of lien was not served until February 17, 1976, four days after Rhoades had exercised his right to discharge the firm. (*Warner v. Basten* (1969), 118 Ill. App. 2d 419, 434-35; *Goldberg v. Perlmutter* (1941), 308 Ill. App. 84, 88.) Thus, by the time the firm attempted to perfect its lien, there was no longer an underlying attorney-client relationship, a necessity for the perfection of the attorney's lien. (See *Catherwood v. Morris* (1935), 360 Ill. 473, 480, noting that the lien attaches to causes of action entrusted to the attorney for collection.) The Chapman firm's right to recovery, if any, must therefore be based on the relationship between the firm and Rhoades and not on the statutory attorney's lien asserted against the settlement.

Under Illinois law, a client may discharge his attorney

at' any time, with or without cause (*Warner v. Basten* (1969), 118 Ill. App. 2d 419, 434-35; *Goldberg v. Perlmutter* (1941), 308 Ill. App. 84, 88). This rule recognizes that the relationship between an attorney and client is based on trust and that the client must have confidence in his attorney in order to ensure that the relationship will function properly (*Miller v. Solomon* (1964), 49 Ill. App. 2d 156, 167; *Fracasse v. Brent* (1972), 6 Cal. 3d 784, 790, 494 P.2d 9, 13, 100 Cal. Rptr. 385, 389). Yet despite this right to discharge, the rule in Illinois has been that the attorney is entitled to full contract fees if the dismissal was without cause. (See *Town of Mt. Vernon v. Patton* (1879), 94 Ill. 65, 67; *Warner v. Basten* (1969), 118 Ill. App. 2d 419, 435; *Miller v. Solomon* (1964), 49 Ill. App. 2d 156, 167; *Goldberg v. Perlmutter* (1941), 308 Ill. App. 84, 88; but see *In re Estate of Murphy* (1978), 56 Ill. App. 3d 1037, 1040 (holding that a discharged attorney is entitled to reasonable fees for services rendered without discussing whether or not the discharge was justified); *Johnson v. Long* (1973), 15 Ill. App. 3d 506, 507-08 (noting that the equitable solution is for a wrongfully discharged attorney to receive a fee based on the reasonable value of services rendered).) Rhoades conceded that the Chapman firm had done nothing to displease him between the afternoon he signed the retainer and the next morning when his wife called Chapman and Chapman to tell the firm that he no longer wished to file suit.

The rule that a wrongfully discharged attorney is entitled to contractual fees protects attorneys against arbitrary dismissals and against unscrupulous defendants who might induce plaintiffs to discharge their attorneys, even after the attorney has expended time and effort, in order to avoid having to pay plaintiffs a larger settlement. However, it is questionable that the rule is necessary for those purposes. (See *Fracasse v. Brent* (1972), 6 Cal. 3d 784, 494 P.2d 9, 100 Cal. Rptr. 385.) In addition, to apply

the rule threatens to undermine other important values and countervailing considerations. To require the client to pay the discharged attorney the full contract fees would make the right to discharge even without cause largely meaningless since the client's contractual financial responsibility to the discharged attorney would be unchanged, unless the client could establish cause for discharge. In this case, Rhoades discharged the law firm before even a single business day had elapsed after he had signed the retainer; thus little, if any, legal work could have been done before the discharge. To permit the firm to receive 25% of Rhoades' settlement, as provided by the retainer, would under these circumstances raise a question of excessive fees (see *In re Kutner* (1979), 78 Ill. 2d 157). Furthermore, a client is a consumer of legal services, and this State has an established policy of protecting consumers as reflected, for example, in section 2B of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1977, ch. 121½, par. 262B), which permits a consumer to avoid certain sales contracts within three business days after entering into the contract of sale.

Other jurisdictions have reached the conclusion that an attorney discharged without cause is not entitled to recover contract fees from his former client but is limited to reasonable fees for services rendered (see, *e.g., Fracasse v. Brent* (1972), 6 Cal. 3d 784, 494 P.2d 9, 100 Cal. Rptr. 385; *Covington v. Rhodes* (1978), 38 N.C. App. 61, 247 S.E.2d 305; *cf. Heinzman v. Fine, Fine, Legum & Fine* (1977), 217 Va. 958, 234 S.E.2d 282 (holding under the Virginia attorney's lien statute that attorneys discharged without cause are entitled only to reasonable fees). In reaching this conclusion, the California Supreme Court in *Fracasse v. Brent* (1972), 6 Cal. 3d 784, 494 P.2d 9, 100 Cal. Rptr. 385, reasoned that the client's right to discharge his attorney at will is not a breach of contract but a term of the contract implied by law because of the special relationship between attorney and client and that it would

be anomalous and unjust to hold a client liable in damages for exercising that implied right. The court rejected the argument that it would be too difficult to ascertain the amount of recovery under a *quantum meruit* theory since such calculations are often made in other situations. It also rejected the argument that the abandonment of the rule granting attorneys discharged without cause full contract fees would encourage unjustified discharging of attorneys by clients motivated solely by a desire to avoid attorneys' fees. In most instances, clients would hire another attorney and would still be liable for fees; in cases in which an attorney who has done much work is fired immediately before a settlement is reached, the factors involved in determining a reasonable fee would justify a finding that the entire contract fee is the reasonable value of services rendered. The California court concluded that its holding protected the client's right to discharge the attorney and also acknowledged the attorney's right to fair compensation for work performed.

We agree with the reasoning in the California case and hold, in the interest of justice, that under the facts of this case, Chapman and Chapman is entitled to be paid on a *quantum meruit* basis a reasonable fee for services rendered before discharge. Accordingly the decision of the appellate court is reversed, and the cause is remanded to the circuit court for a determination of attorney's fees.

*Reversed and remanded,*
*with directions.*