THIRD DIVISION
February 21, 2007

No. 1-06-0346

| | | |
|---|---|---|
| *In re* ESTATE OF | ) | Appeal from |
| | ) | the Circuit Court |
| SYLVIA HORWITZ, Deceased, | ) | of Cook County. |
| | ) | |
| (J. Nicolas Albukerk, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | No. 03 P 8397 |
| | ) | |
| v. | ) | |
| | ) | |
| Estate of Sylvia Horwitz, Deceased, | ) | Honorable |
| | ) | James W. Kennedy, |
| Respondent-Appellee). | ) | Judge Presiding. |

PRESIDING JUSTICE THEIS delivered the opinion of the court:

Petitioner J. Nicolas Albukerk appeals from an order of the circuit court denying his claim for attorney fees in *quantum meruit* against the Estate of Sylvia Horwitz, deceased (Estate), arising from his representation of Sylvia in a medical malpractice lawsuit prior to her death. On appeal, petitioner contends that the circuit court erred in denying him his fees where the contingent-fee contract had terminated and he was discharged before he completed his services. For the following reasons, we reverse and remand for further proceedings.

BACKGROUND

In March 2000, Sylvia Horwitz filed a medical malpractice action against Illinois

Masonic Hospital for injuries she sustained while a patient there. Shortly thereafter, Sylvia was declared incompetent, and the Illinois Office of the State Guardian was appointed plenary guardian of her estate and person. One of her sons, Edward Glaser, was appointed as limited guardian of Sylvia's estate for purposes of making decisions regarding the medical malpractice litigation. On August 21, 2002, petitioner entered into a contingent- fee agreement to represent Sylvia in the litigation. Edward signed the agreement as guardian and next friend of Sylvia. The agreement provided, *inter alia*, that Sylvia would reimburse petitioner for expenses incurred after the fees were deducted from the gross amount of money recovered, but that Sylvia would be ultimately responsible for the expenses incurred regardless of the outcome of the case.

During the pendency of the medical malpractice litigation, Darrell Horwitz, Sylvia Horwitz's other son, filed a lawsuit on behalf of Sylvia against a nursing home for failing to protect her from Edward, whom the nursing home had accused of sexually molesting their mother. Edward was then discharged as Sylvia's limited guardian and the Office of the Cook County Public Guardian (Public Guardian) was appointed plenary guardian of Sylvia's person and temporary guardian of her estate. On July 11, 2003, the guardianship estate received approximately $75,000.00 following a settlement of the lawsuit against the nursing home. On July 18, 2003, Sylvia died intestate.

Thereafter, confusion ensued regarding petitioner's authorization to continue the underlying medical malpractice action. On October 1, 2003, prior to the appointment of a representative of her probate estate, petitioner filed a motion before Judge Harrison seeking to have some of the litigation expenses incurred after Sylvia's death paid for out of the guardianship

estate. Therein, petitioner stated that Sylvia had recently died, and that no action had been taken to convert her guardianship estate into a probate estate. Due to changes in the law, petitioner encountered additional unexpected expenses in the medical malpractice matter, and requested that $5,250 be disbursed from the guardianship estate to pay for these costs. The order of the court does not appear in the record, but the parties do not dispute that the motion was denied. On November 3, 2003, letters of office were issued and the brothers, Edward and Darrell, were appointed independent co-administrators of Sylvia's probate estate.[1]

On November 18, 2003, petitioner filed an emergency motion in the probate division for leave to continue to prosecute the medical malpractice case. There were several continuances, but no ultimate ruling appears in the record. On December 1, 2003, petitioner sent a letter to counsel for the estate. Therein, he stated to counsel that "[b]ecause of [Sylvia's] death in July we need to be re-authorized to prosecute the medical malpractice case." Thus far, [Edward and Darrell] have refused to give us that authorization and have specifically told us not to spend any money on the case." Petitioner further stated, "[i]f we do not receive authority to prosecute this case we will submit not only our costs but also our hourly fee based on a theory of *quantum-meruit*."

Thereafter, on January 6, 2004, Edward and Darrell signed an affidavit, drafted by petitioner, stating that they did not authorize petitioner to continue to prosecute the medical malpractice case and that they were terminating petitioner's employment. They also stated

---

[1] The record does not explain how Edward was appointed as a co-administrator of the estate where the settlement funds disbursed to the estate were garnered based upon Edward's alleged improper conduct toward his mother.

therein that they had been fully informed that petitioner may seek his costs or his hourly fee from the Estate. The brothers did not hire new counsel to prosecute the medical malpractice claim. On February 3, 2004, the case was dismissed for want of prosecution.

On April 20, 2004, petitioner filed a claim against the Estate in the amount of $76,345.28 for the litigation expenses and fees incurred in the medical malpractice case up through January 29, 2004. He filed an amended claim on November 15, 2004. During the pendency of petitioner's fee claim, Darrell filed a complaint against him with the Illinois Attorney Registration and Disciplinary Commission (ARDC). In a letter to the ARDC, Darrell stated that petitioner sought to use funds from the guardianship estate to pay for the litigation costs of an expert nurse he had hired in the medical malpractice litigation. Darrell and Edward "were both against it if it involved [their] footing the bill for him to pursue it." Darrell further stated that "[petitioner] said he would not continue the case unless [they] allowed him to use the money from the estate" to pay for these litigation expenses. Darrell indicated that he wanted petitioner to continue to pursue the case, that he was under the impression that it was being worked on under a contingent-fee agreement, and that he did not want to advance the litigation costs with the funds from the Estate.

In response, petitioner wrote a letter to the ARDC. Therein, he stated that after Sylvia's death, there was confusion over who had authority to continue the litigation until a probate estate was opened and the brothers were appointed co-administrators. Prior to Sylvia's death, petitioner had sought permission from the guardian to use some of the funds in the estate to pay for litigation expenses. He stated in the letter that he had been authorized by the guardian to use the

funds, but needed court approval for their disbursement. After Sylvia's death, he explained to the brothers that he had to hire an additional expert due to a change in the law, and sought a court order to pay for the expert through the guardianship estate funds. Darrell indicated to him that the expenses were petitioner's "problem" and that he should not have to pay for them at all. According to the letter, petitioner told Darrell that he would pay for the cost of the expert "up front," but the expenses would ultimately be the brothers' responsibility regardless of the outcome of the case. Petitioner further indicated that the brothers told him they did not want to spend any more money on the case, and petitioner decided that he could not continue the litigation unless he "received clear authority to continue from either a court with jurisdiction or Eddie and Darrell." On September 28, 2004, the ARDC informed petitioner that it would be taking no further action on the complaint.

Subsequently, the court held a hearing on petitioner's claim for fees and costs. At that hearing, petitioner testified consistently with his letter to the ARDC that just prior to Sylvia's death, he had several discussions with a representative from the Public Guardian about using some of the funds from the guardianship estate to pay for unexpected litigation expenses in the medical malpractice case. Petitioner requested of the Public Guardian that $5,000 of those funds be disbursed to pay for the nursing expert due to a recent change in medical malpractice law. The Public Guardian agreed that it was a good idea and authorized this expenditure, but petitioner was told that he would have to get approval from the court to be awarded these funds. Sylvia died before he filed his motion seeking the disbursement of these funds. Due to Sylvia's death, he "didn't know if [he] had authorization to continue the litigation." When he filed his

motion for the funds in the guardianship estate, he was told that the court no longer had jurisdiction to disburse those funds.

After the brothers were appointed co-administrators of the Estate, petitioner sought Darrell's and Edward's permission to use Estate funds to pay for the nursing expert. According to petitioner, the brothers did not want him to spend any money on the case and refused to even reimburse him because they did not want to be responsible for at all for the costs. Petitioner stated that he could not continue to prosecute the case without spending money and he needed the brothers' authority to do that. He could not reach a resolution beneficial to the Estate because Darrell insisted that petitioner drop his demand for reimbursement of the expenses. Petitioner wrote a letter to counsel for the Estate and that counsel read the letter to both brothers in petitioner's presence, indicating that petitioner would agree to front the cost of the experts and expenses, but that the costs would ultimately be the brothers responsibility. Counsel for the Estate did not respond to his letter or attempt to correct petitioner's assessment of the facts. Additionally, at the time the brothers signed the affidavit discharging petitioner from the case, counsel for the Estate was present and explained the affidavit to the brothers.

Darrell testified at the hearing that after the death of his mother, he wanted petitioner to continue to pursue the medical malpractice case, but he "wanted [petitioner] to spend the money out of his own pocket up front and [petitioner] would be reimbursed later on from the estate, just like his agreement that he had signed with my brother originally." He denied that he ever told petitioner not to spend any money on the case. Darrell testified that petitioner told him he would not continue to represent him in the case unless he could use the funds from the Estate to pay for

the costs of the litigation in advance of trial or recovery. He was forced to sign the affidavit discharging petitioner from the case because he believed that he had only two choices: to allow petitioner to use the Estate funds in advance or to fire him as counsel. Edward concurred that petitioner sought the funds from the Estate to pay for the litigation costs, that he told petitioner that he would reimburse him the funds when the case was over as provided by the agreement he signed on behalf of his mother, and felt he was pressured to discharge petitioner.

Following the hearing, the court did not make any findings of fact or make any credibility determinations on the record. The order entered by the court indicated that both parties had breached the contingent-fee agreement. The court awarded petitioner his costs and expenses, but denied him any fees under *quantum meruit*. On a motion for clarification and reconsideration as to why petitioner breached the agreement, the court held that petitioner breached the contingent-fee agreement "by requesting that the guardianship pay some of the litigation expenses in a hearing on October 1, 2003, before Judge Harrison after the death of [Sylvia]." Petitioner filed a timely appeal.

ANALYSIS

Petitioner contends that the circuit court erred in denying him *quantum meruit* for services he performed in representing Sylvia in the medical malpractice litigation. Initially, the Estate argues that petitioner never raised any issues regarding the effect of Sylvia's death on the operation of the contingent-fee agreement below and, therefore, has waived the right to make this argument on appeal. We find that petitioner indeed sufficiently raised this issue below and note that waiver is a limitation on the parties and not on this court. Accordingly, we will consider

1-06-0346

petitioner's argument on appeal. Camco, Inc. v. Lowery, 362 Ill. App. 3d 421, 433, 839 N.E.2d 655, 665 (2005).

Generally, when a client dies, the attorney-client relationship terminates, and thereafter, the attorney must obtain authorization from the decedent's personal representative in order to pursue the interests of the decedent. In re Estate of Simmons, 362 Ill. App. 3d 944, 946, 841 N.E.2d 1034, 1035 (2005). In the absence of this authorization, the attorney cannot proceed because he no longer represents a party to the litigation. Estate of Simmons, 362 Ill. App. 3d at 946, 841 N.E.2d at 1035. When the attorney-client relationship terminates, the contingent-fee contract ceases to exist, and the contingency terms are no longer operative. In re Estate of Callahan, 144 Ill. 2d 32, 40, 578 N.E.2d 985, 987 (1991).

An attorney who enters into a contingent-fee agreement with a client and is discharged by the client without cause "is entitled to be paid on a *quantum meruit* basis a reasonable fee for services rendered before discharge." Estate of Callahan, 144 Ill. 2d at 38, 578 N.E.2d at 988, quoting Rhoades v. Norfolk & Western Ry. Co., 78 Ill. 2d 217, 230, 399 N.E.2d 969, 975 (1979). The attorney's claim for compensation under a *quantum meruit* theory accrues immediately after his services are terminated even in the absence of any monetary recovery. Estate of Callahan, 144 Ill. 2d at 40, 578 N.E.2d at 988. Thus, it is possible for a client "to receive services and yet not be enriched in a tangible way." Estate of Callahan, 144 Ill. 2d at 41, 578 N.E.2d at 989, citing D. Dobbs, Handbook on the Law of Remedies §4.2, at 237 (1st ed. 1973).

In the instant case, although the trial court never stated its findings of fact or credibility determinations on the record, the court ultimately found that petitioner breached the contingent-

fee agreement in October 2003, by filing a motion before the court seeking a disbursement of funds from the guardianship estate to pay for some litigation expenses. As a result of this action, the court found that petitioner forfeited his fees in *quantum meruit.*

The findings of the trial court will not be reversed unless they are against the manifest weight of the evidence. Hoxha v. LaSalle National Bank, 365 Ill. App. 3d 80, 84, 847 N.E.2d 725, 728 (2006). We find that the trial court's judgment was against the manifest weight of the evidence in the record. The undisputed evidence in the record was that prior to Sylvia's death, Edward had been removed as guardian of her estate and only the Public Guardian had authority to act on behalf of Sylvia with respect to the medical malpractice claim. At that time, petitioner had specifically received authorization from the Public Guardian to use some of the funds from the guardianship estate to pay for some of the litigation expenses, but was told that he would need court approval. At the time petitioner sought the court's approval in October 2003, Sylvia had died and the brothers had no authority to prosecute the litigation. Therefore, where the Public Guardian had authorized the expenditure, there could be no breach of the contingent-fee agreement in seeking court approval for that disbursement. Accordingly, the trial court erred in holding that petitioner forfeited his fees in *quantum meruit.*

Rather, in the absence of any proper authorization from the brothers to maintain the lawsuit once letters of office were issued, petitioner was effectively discharged from the case upon Sylvia's death and his entitlement to *quantum meruit* vested at that time. Estate of Callahan, 144 Ill. 2d at 40, 578 N.E.2d at 988; Estate of Simmons, 362 Ill. App. 3d at 947-48, 841 N.E.2d at 1036-37. Therefore, the order of the circuit court denying petitioner's claim for

attorney fees under *quantum meruit* is reversed and the cause is remand for a hearing to determine the reasonableness of those fees. On remand, petitioner will bear the burden of establishing the value of his services up until July 18, 2003, the date of Sylvia's death. In making its determination, the court may consider a number of factors including petitioner's skill and standing, the nature of the litigation, the time and labor expended, and the benefits, if any, resulting to the client. Estate of Callahan, 144 Ill. 2d at 43-44, 578 N.E.2d at 990.

Reversed; cause remanded with directions.

GREIMAN and KARNEZIS, JJ., concur.