2024 IL App (2d) 230007
No. 2-23-0007
Opinion filed May 28, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| KIMBERLY LAYDEN and MICHAEL TRACY, as Beneficiary of Chicago Title Land Trust Company Trust No. 1006000783, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 18-CH-928 |
| | ) | |
| CHICAGO TITLE LAND TRUST COMPANY, as Trustee of Chicago Title Land Trust Company Trust No. 8002362712, CEZARY JAKUBOWSKI, and EVA JAKUBOWSKI, | ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Kimberly Layden, Plaintiff-Appellant; O'Donnell Callaghan LLC, Appellee). | ) ) | Janelle K. Christensen, Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1    Appellee, O'Donnell Callaghan LLC (law firm), formerly represented plaintiff-appellant, Kimberly Layden, in several underlying actions and had its attorney Robert T. O'Donnell petition the circuit court for a statutory or equitable lien for attorney fees it claims it was owed after plaintiff fired the law firm. The circuit court granted an equitable lien and entered judgment against plaintiff for $298,474.98. Plaintiff appeals. During the pendency of the appeal, on December 6, 2023, the

law firm filed a motion to supplement the record with a satisfaction and release of judgment in the lien action, a cancelled check in the amount of the judgment with interest, and correspondence from plaintiff's present attorney discussing the payment of the lien. We, ultimately, granted the motion to supplement, on March 12, 2024. For the following reasons, we conclude that any issues regarding the imposition of an equitable lien are moot, as the order on appeal was superseded by a subsequent release in the lien action. Moreover, the circuit court did not abuse its discretion by ordering plaintiff to pay the law firm on a *quantum meruit* basis; however, the total recovery is limited to the 40% contract rate. Thus, we dismiss in part, affirm in part, and remand in part.

¶ 2                                   I. BACKGROUND

¶ 3    In August 2018, plaintiff and her coplaintiff, Michael Tracy, filed a complaint for damages and injunctive relief against defendants, Chicago Title Land Trust Company, as Trustee of Chicago Title Land Trust Company Trust No. 8002362712, and Cezary and Eva Jakubowski, for violations of the drainage code, various city ordinances, and permit requirements that occurred during the Jakubowskis' home demolition and reconstruction. Plaintiff and Tracy also sought both injunctive relief and a declaratory judgment regarding a beach easement that passed through the Jakubowskis' property.

¶ 4    In March 2019, Tracy requested that the law firm withdraw as his attorney. In response, plaintiff signed a new engagement letter with the firm, changing the terms of engagement from an hourly fee to a 40% contingency fee. In relevant part, the agreement stated:

         "The contingent fee will be 40% of any and all monies recovered or the value of

         any other non-monetary compensation you may receive. For example, if the Jakubowskis

         were to perform work such as repairing the private drive and/or enhanced landscaping

         and/or improved stormwater drainage, we would be entitled to 40% of the value of that

non-monetary compensation. Further, certain of the claims may entitle the prevailing party to recover attorney[ ] fees. Therefore, we will continue to keep track of hours that we spend and send you monthly bills so that you're aware of the time, effort and expense of the case, and, if appropriate, we will file a petition to recover those fees, which will be considered part of the overall compensation you've received and will be subject to the contingent fee formula set forth above.

You will be responsible to pay for any third party consultant/experts. *** To date, the only outstanding bill is that of Larry Traynoff. Mike Tracy will only commit to pay $2,500 based on his 'understanding' that Traynoff's services were not to exceed $5,000. It's not worth fighting about, and I'll ask Larry to make some accommodations on the bill, which I have every reason to expect he will do. You'll then be responsible for the difference between the final bill and the amount contributed by Tracy, likely approximately $3,500 to $4,000."

The contingency arrangement remained in place for the duration of the law firm's representation of plaintiff. However, on June 28, 2021, an addendum to the fee agreement was executed, wherein the parties agreed that the contingency fee would not consider the fair market value of plaintiff's house in determining the settlement amount, *i.e.*, the amount used to calculate the law firm's fees.

¶ 5 On May 20, 2022, the circuit court conducted an in-person settlement conference in advance of trial to discuss plaintiff's claims. The settlement conference resulted in an agreement that included the following terms: (1) the Jakubowskis would pay plaintiff $600,000; (2) the Jakubowskis would purchase plaintiff's home as-is, using an appraiser who is a member of the Appraisal Institute; (3) the Jakubowskis would repair the shared driveway and be able to park on the private driveway; (4) plaintiff would move to vacate any judgment regarding the private

easement, and the case would be dismissed with prejudice; and (5) each party would pay their own fees. Importantly, plaintiff contends that she believed that she could accept or reject the proposed offer of purchase on her home and that defendant would park on the private drive only after plaintiff sold her home. Plaintiff further contends that she was never shown the proposed settlement order, which O'Donnell ultimately signed on her behalf, at the settlement conference.

¶ 6      A few days later, plaintiff received a copy of the proposed settlement order and was upset because she believed it did not accurately memorialize the terms of the settlement, as those terms were explained to her. Chiefly, plaintiff was upset that she did not retain the right to reject defendants' offer to purchase her home. Due to this discrepancy, plaintiff worked with the law firm to create a revised comprehensive written settlement agreement. The parties' deadline for signing the original agreement was extended several times, but, ultimately, on July 15, 2022, defendants filed a motion to enforce the settlement agreement. Earlier that same day, at 3:01 a.m., plaintiff, via e-mail, terminated her engagement with the law firm.

¶ 7      On August 24, 2022, the law firm petitioned to adjudicate an attorney's lien for the total fees and costs of representation—$303,839.98. The law firm contended that plaintiff terminated the firm "in order to void the contingency fee agreement"; thus, it sought payment based on its hourly fee for its rendered services. Nearly one month later, plaintiff responded and argued that the law firm failed to comply with the prerequisites for a statutory attorney's lien because it failed to complete service of the required notices of an attorney's lien prior to the termination of the attorney-client relationship, the lien was not properly collectable because there was not a judgment or settlement proceeds to which it could attach, and the service of notice to plaintiff was "[f]raudulent and [b]izarre." On October 7, 2022, the law firm replied, arguing that plaintiff's 3:01 a.m. e-mail did not terminate the attorney-client relationship; an equitable lien should be imposed

for *quantum meruit*, not the voided contingency fee arrangement; and plaintiff's receipt of the notice of an attorney's lien was a courtesy, not fraudulent activity.

¶ 8 On August 30, 2022, the circuit court held a hearing on defendants' motion to enforce the settlement agreement.

¶ 9 On October 28, 2022, an evidentiary hearing was held on the law firm's petition for an attorney's lien At the hearing, O'Donnell testified that he was the primary attorney representing plaintiff in the underlying matter. He originally represented plaintiff and Tracy on an hourly basis; however, after Tracy retained other counsel, plaintiff requested an alternative fee arrangement. The law firm proposed a 40% contingency fee because monetary recovery would occur in her case only via a settlement agreement since plaintiff did not have any claims for money damages, as the drainage claim (the only claim for damages) pertained to Tracy. The only other monetary component of plaintiff's claims dealt with the potential recovery of reasonable attorney fees. Plaintiff, ultimately, agreed to the contingency fee arrangement. While this arrangement was in place, the law firm maintained a record of the time spent on plaintiff's case. In 2019, plaintiff requested and was given copies of the draft invoice showing the hours expended on her case. Ultimately, the practice of disseminating draft invoices was discontinued, and plaintiff did not receive another bill until her final invoice was sent in 2022.

¶ 10 Tracy, eventually, re-retained the law firm on an hourly fee basis in this matter. During the time that the law firm represented Tracy, the bills that pertained to both plaintiff's and Tracy's case would be split equally and the bills that pertained to each party separately were billed separately. However, after the bill was split, the law firm would occasionally apply a further discount to Tracy's bill because he was paying the law firm's fees monthly. Discounts were not applied to plaintiff's bill because she was not being billed monthly after she switched to the

contingency fee arrangement. Moreover, upward and downward adjustments were made to plaintiff's bill for various reasons, including efficiency of the service provider, accommodating other adjustments, and reasonableness of total time spent.

¶ 11     After various pretrial motions were litigated, O'Donnell testified that a preliminary settlement was reached at the in-person settlement conference in May 2022. Of note, plaintiff was to be paid $600,000 in cash and her home was to be purchased as-is for the fair market value as of May 20, 2022. Based on the parties' agreement, a comprehensive written settlement agreement was to be drafted that would include the settlement document and a real estate contract, which would cover the terms of the sale of plaintiff's house. O'Donnell believed the proposed settlement agreement was very favorable to plaintiff.

¶ 12     After the in-person settlement conference, plaintiff met with O'Donnell and indicated that she had a health issue that persisted throughout the conference and, thus, she did not have the capacity to agree to the terms of the settlement. O'Donnell testified that he explained the ramifications of pursuing plaintiff's lack of capacity defense and that his explanation "pretty much ended that conversation." Instead, O'Donnell continued the meeting by explaining the appraisal process to plaintiff and discussing his contingency fee based on the proposed monetary settlement.

¶ 13     O'Donnell also testified about various e-mails between himself and plaintiff, which detailed plaintiff's understanding of the settlement agreement and the real estate contract and her involvement in revising the specific terms of those documents. That correspondence addressed plaintiff's revisions to the settlement documents up to the weekend before the July 11, 2022, settlement deadline. O'Donnell also detailed various calls he had with plaintiff discussing revisions he noted that were inconsistent with the terms of the preliminary settlement. In fact, he scheduled a call with plaintiff on July 12, 2022, to discuss further discrepancies, but she did not participate.

¶ 14 O'Donnell stated that plaintiff never indicated to him that she did not understand the settlement agreement or that she believed it to be void. In fact, based on plaintiff's e-mail communications, he believed that she understood and accepted the agreement and was "intimately involved" in revising the comprehensive written agreement.

¶ 15 Thereafter, on July 15, 2022, at 3:01 a.m., plaintiff terminated the law firm's services and directed O'Donnell to withdraw from the case. That same day, the law firm served, by certified mail to the Jakubowskis and their attorneys, notice of an attorney's lien. The notice was received by the parties on July 15, 2022. The same day, the Jakubowskis filed an emergency motion to enforce the settlement agreement. Three days later, the circuit court allowed the law firm to withdraw.

¶ 16 Hayleigh Herchenbach, an attorney with the law firm, testified that she also represented plaintiff in this matter. She had been with the law firm for 11 years. A bill was submitted to plaintiff on July 29, 2022, relating to the services provided in this case. The bill showed the tasks that Herchenbach and others completed and the time it took to complete those tasks, even when plaintiff had a contingency fee arrangement. Moreover, several sections of the bill were split with Tracy for services provided when the law firm represented both parties.

¶ 17 Norman Finkel, an attorney with Schoenberg, Finkel, Beederman, Bell & Glazer, and Marty Schwartz, an attorney with Schain, Banks, Kenny, and Schwartz, testified. Finkel opined that both O'Donnell and Herchenbach were exceptional attorneys. Schwartz indicated that he briefly represented Tracy in this matter and, thus, was familiar with the complexity of the issues in this case. Schwartz believed that the law firm obtained a "great settlement" on behalf of plaintiff. Moreover, both Finkel and Schwartz stated that the hourly fee utilized by the law firm in billing was reasonable and fair.

¶ 18    In response to the law firm's evidence, plaintiff called Lawrence Traynoff, a land surveyor utilized as an expert in this case. Traynoff testified that he worked on this case for both plaintiff and Tracy. Traynoff sent multiple e-mails to the law firm regarding invoice Nos. 9273D (December 1, 2021) and 9273C (December 3, 2018). Notably, Traynoff inquired as to whether any portion of the 2018 invoice ($2250) was owed by Tracy, as he was represented by the law firm at the time the bill accrued. Traynoff was informed that the law firm was "looking into it" and would respond back shortly. Traynoff is still owed $4000 for his services in this case.

¶ 19    The parties submitted written closing arguments. The law firm argued that there was no evidence presented that plaintiff was contesting the reasonableness of the rates charged, the difficulty and complexity of the litigation, the "outstanding" result for plaintiff, or the "excellent" skill and standing of the law firm. Moreover, there was no evidence to suggest that any differences between plaintiff's and Tracy's billing were inappropriate, any difference between the draft bill from 2019 and the comprehensive bill from 2022 was improper, or plaintiff did not understand the settlement agreement that she participated extensively in revising.

¶ 20    The law firm also argued that it was entitled to a statutory lien because it provided notice of the lien to all the required parties before it was granted permission to withdraw by the circuit court. Plaintiff's 3 a.m. termination of the law firm was not the formal termination of the law firm's services—the law firm was not formally terminated until it was granted leave to withdraw by the court on July 18, 2022, three days after plaintiff's e-mail. Alternatively, the law firm argued that, if plaintiff's 3 a.m. e-mail terminated the law firm's services, it should be granted an equitable lien. At a minimum, the law firm sought recovery for the full amount contracted for in the contingency fee agreement—$240,000; however, considering that plaintiff terminated the contingency fee arrangement when she terminated the law firm's services, the firm also requested

recovery for the full amount of value for its services performed under a theory of *quantum meruit*—$301,589.98.[1]

¶ 21   In plaintiff's closing argument, she asserted that in its petition to adjudicate an attorney's lien the law firm failed to request equitable relief or an award for *quantum meruit* and failed to meet the statutory requirements to perfect its lien under the Attorneys Lien Act (770 ILCS 5/0.01 (West 2022)), because notice to the parties was not completed until after the termination of the attorney-client relationship. Moreover, plaintiff alleged that it was improper to adjudicate a lien as to settlement funds that were not in existence (the motion to enforce the settlement was still pending at this time) and any potential equitable lien should not attach to expert fees and costs because this was not included in the original contingency agreement.

¶ 22   Plaintiff also addressed the evidence adduced at the hearing and asserted that the law firm lied, engaged in "bill padding," and created new billing entries where none previously existed. Plaintiff, therefore, requested that the law firm's attorney fees be forfeited. However, plaintiff argued alternatively that the fee award, if one was warranted, should not exceed the contractual contingency fee.

¶ 23   On December 5, 2022, the circuit court filed a joint order, granting defendants' motion to enforce the settlement agreement and addressing the law firm's petition for an attorney's lien. The court reiterated the relevant facts covered at the hearing on the petition and considered the relevant provisions from the contingency fee agreements. Addressing a statutory lien, the court noted that it was undisputed that plaintiff terminated the attorney-client relationship before notice of a

---

[1]The total recovery was adjusted to reflect the law firm's concession that it had duplicative bills from Traynoff and that its total recovery should be reduced by $2250 from its initial request.

statutory lien was served on defendants. The court strictly construed the terms of the Attorneys Lien Act and found that a statutory lien did not exist here because the law firm failed to satisfy the elements of a statutory lien (notice) before the termination of the attorney-client relationship.

¶ 24    Instead, the court found that an equitable lien existed because the contingency agreement and the addendum definitely fixed the rate of compensation and, since the court also determined that the settlement agreement was enforceable, there was a *res* to which the obligation attached. Thereafter, the court found that the contingency agreement was void and unenforceable after plaintiff terminated the law firm; thus, the court concluded that the law firm would recover fees in *quantum meruit*. The court determined that, generally, the law firm's requested fees were reasonable, considering the caliber of the attorneys, the number of hours worked, and the complexity of the issues in the case; however, the court redacted 8.9 hours from the final billing statement, which represented the upward adjustment between the 2019 draft bill and the 2022 final invoice. Accordingly, the court concluded that the law firm was entitled to a judgment of $298,474.98 plus interest.

¶ 25    On December 7 and 13, 2022, the law firm filed citation notices to discover plaintiff's income and assets. A hearing was set, wherein "the court may compel the application of any discovered income or assets toward payment on the judgment." Twenty days later, plaintiff filed a motion to clarify whether the court's judgment was freestanding or whether the judgment attached to the anticipated settlement proceeds because plaintiff's assets were frozen due to the law firm's filing of the citation notices. On January 4, 2023, plaintiff appealed the December 5, 2022, order. On January 27, 2023, the court granted the motion to clarify but did not amend or modify its December 5 order.

¶ 26 On August 17, 2023, plaintiff filed a motion to voluntarily dismiss certain appellees from the appeal. Namely, plaintiff stated that she reached a settlement with the Jakubowskis and Chicago Title Land Trust Company, as trustee of Chicago Title Land Trust Company trust No. 8002362712, and thus, she was no longer pursuing the appeal from the motion to enforce the settlement agreement addressed in the December 5 order. Accordingly, the only remaining issues on appeal related to the order denying the motion to reopen proofs and granting the petition for an attorney's lien. Plaintiff noted that the law firm was the only remaining appellee necessary for this appeal. We granted plaintiff's motion on August 25, 2023.

¶ 27 Briefing commenced on the appeal. Of note, the law firm filed its brief and a motion to supplement the record on December 6, 2023. The supplement contained correspondence and cancelled checks showing that the Jakubowskis tendered the settlement payment to plaintiff and that she directed the Jakubowskis to remit $315,475.79 (judgment amount plus statutory interest) to the law firm "to pay off the judgment lien in favor of O'Donnell." In response, plaintiff was provided a release and satisfaction of lien on July 25, 2023. We originally denied this motion to supplement; however, after seeking further argument from the parties, we *sua sponte* vacated our denial and granted the motion to supplement on March 12, 2024.

¶ 28                                     II. ANALYSIS

¶ 29                                     A. Mootness

¶ 30 On appeal, the law firm informed this court, through its motion to supplement, that all the amounts due and owning had been satisfied, including attorney fees and postjudgment interest. As a result of this revelation, we ordered plaintiff to respond to the motion to supplement and explain whether (or to what extent) the proposed supplemental materials would render this appeal moot.

Accordingly, we first address whether any issues are moot considering the full satisfaction of the judgment.

¶ 31    An issue is moot if no actual controversy exists or where an appellate finding will not have any legal effect on the controversy. *Dixon v. Chicago & North Western Transportation Co.*, 151 Ill. 2d 108, 116 (1992). "This court will not review cases merely to establish a precedent or guide future litigation." *Madison Park Bank v. Zagel*, 91 Ill. 2d 231, 235 (1982). If, at any point during the pendency of the appeal, it is discovered that intervening events occurred that now preclude relief to any party, mootness should be addressed. *Dixon*, 151 Ill. 2d at 116; *In re Tekela*, 202 Ill. 2d 282, 292-93 (2002). This is true even when the intervening facts do not appear in the appellate record. See *Dixon*, 151 Ill. 2d at 116-17 (a reviewing court may take judicial notice of such events or facts that, while not appearing in the record, disclose an actual controversy no longer exists between the adverse parties).

¶ 32    Plaintiff's payment of the law firm's judgment for attorney fees and the subsequent release and satisfaction of the lien has rendered moot any issue regarding the existence of a valid equitable lien. A lien is not a separate property right, nor does it embody the underlying debt; rather, an equitable lien is merely a mechanism to collect an underlying debt. *Paine/Wetzel Associates, Inc. v. Gitles*, 174 Ill. App. 3d 389, 393 (1988). Here, once the judgment was paid and the release and satisfaction of the judgment was received by plaintiff, the lien was extinguished. Once the lien was extinguished, any underlying controversy relating to the enactment of the lien became moot, as it is now futile for this court to rule on an issue that will not have any practical effect on the controversy. *Tekela*, 202 Ill. 2d at 292-93. Thus, we will not address plaintiff's issues relating to the existence of an equitable lien.

¶ 33    Regarding the amount of the underlying judgment, "it is well established that the payment or satisfaction of a money judgment by a judgment debtor does not bar the prosecution of *** an appeal by such judgment debtor." *Pinkstaff v. Pennsylvania R.R. Co.*, 31 Ill. 2d 518, 523 (1964). However, when a judgment has been voluntarily paid, the basis for the appeal is waived. *Mirar Development, Inc. v. Kroner*, 308 Ill. App. 3d 483, 486 (1999) (citing *County of Cook v. Malysa*, 39 Ill. 2d 376, 379 (1968) ("[T]he general rule in civil cases [is] that when a judgment has been voluntarily paid or its benefits accepted the question becomes moot.")). Contrarily, if the payment is compulsory, the issue is not moot. *Northbrook Bank & Trust Co. v. Abbas*, 2018 IL App (1st) 162972, ¶ 28. Thus, the question is whether the satisfaction of the judgment was compulsory or voluntary.

¶ 34    We conclude that the satisfaction of the judgment in this case was compulsory. After the judgment was entered, the law firm commenced collection proceedings, which included filing citations to discover plaintiff's assets and setting a hearing wherein plaintiff could be compelled to utilize any discovered assets to pay the judgment. *Id.* (finding that payment was compulsory after collection proceedings were initiated). Under these circumstances, the payment of the judgment was compulsory and, thus, the payment of the judgment does not render moot the totality of the appeal. Accordingly, we now turn to the merits of the appeal.

¶ 35                                    B. Reasonableness of Fees

¶ 36    Plaintiff contends that the circuit court erred by (1) allowing recovery of the law firm's fees in *quantum meruit*, (2) allowing recovery for litigation costs and expenses, and (3) finding that the law firm's fees were reasonable.

¶ 37    This court reviews for an abuse of discretion the decision to award attorney fees. *Kannewurf v. Johns*, 260 Ill. App. 3d 66, 74 (1994). Generally, the circuit court has broad

discretion to set attorney fees, since it has the advantage of closely observing the attorney's work and it has an intimate understanding of the skill and time required for the case. *Id.* Overall, the issue is not whether we agree with the decision of the circuit court; rather, we must consider whether the circuit court acted "arbitrarily, unconscientiously, without reason, or beyond the bounds of law." *Id.*

¶ 38 A client can terminate an attorney at any time with or without cause. *DeLapaz v. Selectbuild Construction, Inc.*, 394 Ill. App. 3d 969, 973 (2009). However, if a client terminates a contingency fee contract, the contract becomes unenforceable and the attorney cannot recover under that contract. *Id.* Instead, the discharged attorney may recover only under a theory of *quantum meruit.* *Thompson v. Buncik*, 2011 IL App (2d) 100589, ¶ 8. This means that the court is to award the attorney " 'as much as he [or she] deserves.' " *Id.* (quoting *Wegner v. Arnold*, 305 Ill. App. 3d 689, 693 (1999)). Accordingly, the court must consider what fees the attorney earned before being terminated.

¶ 39 In this calculation, courts consider

> "the time and labor required, the attorney's skill and standing, the nature of the cause, the novelty and difficulty of the subject matter, the attorney's degree of responsibility in managing the case, the usual and customary charge for that type of work in the community, and the benefits resulting to the client." *Will v. Northwestern University*, 378 Ill. App. 3d 280, 304 (2007).

The "burden of proof is on the attorney to establish the value of his [or her] services." *Thompson*, 2011 IL App (2d) 100589, ¶ 10. Notably, in cases where the attorney-client relationship is terminated immediately prior to the resolution of a case, courts find that the foregoing factors generally justify a finding that *the entire contract fee* is the reasonable value of services rendered,

even though the attorney may not recover under the terms of the original contingency fee contract. *DeLapaz*, 394 Ill. App. 3d at 973-74; *Rhoades v. Norfolk & Western Ry. Co.*, 78 Ill. 2d 217, 230 (1979). Moreover, costs may be recovered under the theory of *quantum meruit* but only up to the original contract rate. *Howard v. Proviso Township High School SD 209 Board of Education*, No. 21-C-3573, 2023 WL 6847040, at *4 (N.D. Ill. Oct. 17, 2023) (awarding costs and fees in *quantum meruit* but only up to the agreed contingency contract rate).

¶ 40    We note that our decision here is limited to the specific facts of this case. There is no issue regarding the timing of the filing of the petition for an attorney's lien or the amount of the settlement award. See *In re Estate of Callahan*, 144 Ill. 2d 32, 40-42 (1991) (concluding that a law firm may seek fees at the time of termination and need not wait to petition for fees until the conclusion of the case). Here, hearings were held on the motion to enforce the settlement and the law firm's petition for an attorney's lien within two months of one another. Moreover, the circuit court filed a joint order addressing both issues. As such, the circuit court knew the amount of the settlement award at the time fees were ordered.

¶ 41    In this case, it was reasonable for the circuit court to award *quantum meruit* recovery. (However, as we explain *infra*, ¶ 44, the *quantum meruit* factors and case law favor awarding the law firm no more than the amount it would have received under its contingency fee arrangement with plaintiff (*i.e.*, 40% of the settlement amount)). The law firm provided ample evidence of its timed entries detailing the work that was performed, who performed the work, and the overall complexity of and skills required for the case. There was also sufficient evidence to show that outstanding costs remained to be paid to Traynoff and that plaintiff agreed to pay those costs. The law firm spent hundreds of hours over several years, which culminated in an agreed settlement between the parties in May 2022. We conclude that the circuit court's order allowing the law firm

to recover on a *quantum meruit* basis was reasonable and fair, considering the unrebutted testimony supporting O'Donnell's and Herchenbach's skill and experience, the factual and legal complexities in the case, the remaining costs in the case, the testimony supporting the "outstanding" outcome, and the testimony from Schwartz indicating that the law firm's rates were reasonable considering his work for Tracy. The law firm's work in this case resulted in a $600,000 settlement payout for the vacatur of plaintiff's easement rights—40% of which would have been due to the law firm had plaintiff not terminated the attorney-client relationship on the eve of the motion to enforce the settlement. The law firm represented plaintiff to the substantive end of her case, and, under the circumstances, the court did not err in determining that the law firm is entitled to recover in *quantum meruit*.

¶ 42    Plaintiff argues, citing *Achs v. Maddox*, 175 Ill. App. 3d 989, 995-96 (1988), that the circuit court erred by imposing an equitable lien for litigation costs. *Achs* is immaterial here. As indicated above, the issue of whether there was a valid equitable lien imposed in this case is moot because the lien has been extinguished. Regarding the circuit court's judgment order for litigation costs, it was not unreasonable for plaintiff to be ordered to pay the remainder of Traynoff's costs, as testimony showed that Tracy paid his portion of the costs and plaintiff signed a contractual agreement to pay the balance. See *id.* at 996 (also finding that a client remains "ultimately liable for expenses advanced," even where the attorney-client agreement is silent as to who would bear expenses). *Achs* does not stand for the proposition that a client may forgo paying the expenses of litigation, and we will not read this into the case. *Id.*

¶ 43    Additionally, plaintiff asserts that the law firm forfeited its attorney fees because of "clear bill padding," misconduct, and "blatant unethical conduct." Where an attorney clearly violated the canons of ethics, the attorney fees may be forfeited in *quantum meruit*. *American Home Assurance*

*Co. v. Golomb*, 239 Ill. App. 3d 37, 41 (1992); see *Vandenberg v. RQM, LLC*, 2020 IL App (1st) 190544, ¶ 41. We find that the circuit court ordering *quantum meruit* recovery, after hearing plaintiff's claims of bill padding and other unethical conduct, was neither against the manifest weight of the evidence nor an abuse of discretion. The court found certain of plaintiff's arguments "perplexing and not supported by the record." Moreover, after reviewing the bills, it found, based on O'Donnell's explanations regarding the differences in Tracy's and plaintiff's bills, that the bills were, generally, fair and split equitably. The circuit court did, however, reduce plaintiff's bill by 8.9 hours to reflect changes between the 2019 draft bill and the 2022 final invoice. Nonetheless, the court expressly disagreed with plaintiff's claims that O'Donnell violated established canons of ethics. The court considered and weighed the credibility of the parties, considered the quantity and the quality of the work provided, and found that O'Donnell "reached an excellent resolution for [plaintiff]." Accordingly, we conclude that the circuit court's repudiation of plaintiff's allegations of ethical violations and its award of costs and fees in *quantum meruit* was reasonable.

¶ 44      However, it was unreasonable for the circuit court to include fees and costs for more than the contract rate ($240,000) in its order. The law firm provided no authority supporting its claim for *quantum meruit* recovery in excess of its original contract rate, where the settlement award was known at the time the petition was granted. Moreover, case law and policy do not support recovery under *quantum meruit* for more than an attorney would be entitled to under a prior fee agreement. It is well established that, "[i]n cases in which an attorney who has done much work is fired immediately before settlement is reached, the factors involved in determining a reasonable fee would justify a finding that *the entire contract fee* is the reasonable value of services rendered." (Emphasis added.). *Wegner*, 305 Ill. App. 3d at 693. Further, when a fee dispute involves multiple attorneys who have provided services at different times, reviewing courts have found that the

former attorney's *quantum meruit* fees will be subtracted from the contract rate amount and the remainder of the contract rate will be given to the subsequent attorney. See, *e.g.*, *Johns v. Klecan*, 198 Ill. App. 3d 1013, 1024 (1990). Both instances persuade us that an attorney's recovery under *quantum meruit* is capped at the contract rate. A position contrary to this would have significant negative policy implications: "[f]inding otherwise would create perverse incentives for attorneys to, for example, withdraw from contingency cases for which they are likely to recover less than they initially hoped, in order to void the relevant fee agreement and seek higher fees on a *quantum meruit* basis." *Howard*, 2023 WL 6847040, at *4. Accordingly, we conclude that awarding the law firm a windfall in this case was unreasonable.

¶ 45　In sum, the circuit court did not abuse its discretion by allowing the law firm to recover on a *quantum meruit* basis. However, the law firm was entitled only to a *quantum meruit* award that did not exceed the prior contract rate, or 40% of the monies recovered. This case is remanded to the circuit court to reassess recovery in *quantum meruit* where the award is capped at the prior contract rate and to consider whether any previously applied billing adjustments still apply.

¶ 46　　　　　　　　　　　　III. CONCLUSION

¶ 47　For the reasons stated, we dismiss in part, affirm in part, and remand in part the judgment of the circuit court of Lake County.

¶ 48　Affirmed in part and dismissed in part; cause remanded.

*Layden v. Chicago Title Land Trust Co.*, 2024 IL App (2d) 230007

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 18-CH-928; the Hon. Janelle K. Christensen, Judge, presiding. |
| **Attorneys for Appellant:** | Scott A. Nehls and Alex C. Wimmer, of Fuchs & Roselli, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Robert T. O'Donnell and Hayleigh Herchenbach, of O'Donnell Callaghan LLC, of Libertyville, for appellee. |